**Ronald A. TORNCELLO and Soledad Enterprises, Inc.**

v.

**The UNITED STATES.**

No. 486–80C.

United States Court of Claims.

June 16, 1982.

Robert L. Purvin, Jr., San Diego, Cal., for plaintiffs. Lawrence W. Campbell, San Diego, Cal., atty. of record.

Richard W. Oehler, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, BENNETT and SMITH, Judges, en banc.*

BENNETT, Judge:

This is a government contract case, before us on motions for summary judgment. At issue is the government's diversion of business away from a party, with whom it had executed a requirements contract, to a competing bidder on the original solicitation. The government defends that this diversion was justified by the constructive application to its actions of the standard "termination for the convenience of the government" clause in federal procurement. For several simple and compelling reasons, involving basic tenets of contract law, we hold that the termination for convenience clause does not apply in the situation here and find the government in breach.

---

* This case came originally before a panel consisting of Chief Judge Friedman and Judges Kunzig and Bennett. Judge Kunzig died on February 21, 1982. Since that time and because of the exceptional importance of the legal issues involved, the court has ordered, pursuant to Rule 7(b), that the case be considered *en banc* upon the original briefs and upon supplemental briefs, but without further oral argument.

Plaintiff was the president of Soledad Enterprises, Inc. (Soledad), a California corporation that is now bankrupt. Plaintiff has succeeded to all of the rights and entitlements of Soledad with respect to the claim in this suit.

On May 31, 1973, Soledad bid for a grounds maintenance and refuse removal contract to service six Navy family housing projects in the San Diego, California area. The bid solicitation listed 12 types of work to be done under the contract, some of which were to be performed routinely and others only on a "call" basis, and the solicitation specifically provided that "Bids are solicited and award will be made on an all or none basis."

Soledad was awarded this 12-item contract, N62474–73–C–3195, on June 6, 1973. The contract term was one year, running from July 1, and it was extended in June of the next year for another year.

The present dispute concerns item 8 of the original bid, paragraph 4A.17 of the contract. This was a call item:

PLANT DISEASE, INSECT AND RODENT CONTROL. The work shall include the control of agricultural pests, including rodents, weed control, and plant diseases which attack shrubbery, trees and turf grasses. Work authorizations for rodent and pest control will be issued by the Housing Project Managers in accordance with Paragraph 3A.7. The Contractor shall comply with the current code and rules and regulations of the San Diego County Agricultural Department.

Soledad's bid itemization, accepted by the government, specified a per call charge of $500 for any call under the pest control item. This was a high price for common pest control work but was warranted in Soledad's view by the open-ended phrasing of the item, that Soledad could be called in for potentially expensive tasks.

It turned out, however, that the Navy only needed gopher control at the housing projects, work that was customarily much cheaper than $500 per call. For this reason, the Navy did not call Soledad under item 8. Soledad realized by August 1973 that it was receiving no item 8 requests and, when it discovered the Navy's reason therefor, Soledad offered in writing to do special gopher control calls for only $35 per call. The Navy still did not request such work from Soledad, however, but called the Department of Navy Public Works, a competing bidder on the original solicitation which had submitted an item 8 figure that was less than Soledad's.

By letter of April 9, 1975, plaintiff took back its offer of $35 per call:

Please be advised that the offer * * * is hereby rescinded. This action is being taken as there was no "Amendment of Solicitation/Modification of Contract" prepared and signed by the government or Soledad Enterprises, Inc. Furthermore, we have reason to believe that the services contracted for in item 8 has [sic] been given to the public works department.

Soledad's bankruptcy followed soon thereafter.

It is stipulated that Soledad never received pest control work under item 8, either under the original contract or under its renewal, at $500 per call or at $35 per call, and it is further stipulated that the Navy did have such work which it gave to Public Works. Soledad's claim is that its agreement with the Navy was for all of the Navy's requirements under the contract and that the Navy breached the contract when it diverted the work under item 8. Soledad claims that it was entitled to service all of the Navy's pest control needs and protests the fact that it got none.

I

Soledad lost its claim before the contracting officer and lost its appeal to the Armed Services Board of Contract Appeals (ASBCA). Although the ASBCA cursorily accepted that the government may have committed a breach, it viewed that issue as unimportant because of the overriding availability to the government of constructive termination for convenience. In full, the ASBCA's argument reads:

It is the appellant's position that this contract was a requirements contract under which the Government was obligated to procure all of the services it required of the type covered by the contract, from the contractor. The appellant claims that the Government failed to order all of those services and that as a result the appellant suffered substantial financial difficulty which led to the eventual default of this and other contracts.

In a similar situation the Court of Claims found it unnecessary to resolve the question of whether or not the contract was a requirements contract. *Charles R. Nesbitt v. United States*, 170 Ct.Cl. 666 [345 F.2d 583] (1965), *cert. denied*, 383 U.S. 926 [86 S.Ct. 931, 15 L.Ed.2d 846] (1966). In order to reach our decision, we assume, without finding, that the representations made by the appellant with regard to its interpretation of the bidding provisions and the subsequent contract were correct.

When the Government fails to comply with its contractual obligations under the type of circumstance present here, the contractor is entitled to recover as if the contract had been terminated pursuant to the termination for the convenience provisions of the contract. *Charles R. Nesbitt v. United States, supra; G. C. Casebolt Company v. United States*, 190 Ct.Cl. 783 [421 F.2d 710, 783] (1970). This contract included what is commonly referred to as a short form termination for the convenience clause which provided that to the extent the contract was for services, the Government was liable only for payment of those services rendered prior to the effective date of termination. In this instance the appellant has established that the Government ordered no services in connection with pest control. Since no pest control services were ordered, under the contract's termination for convenience of the Government provisions, the appellant is not entitled to any additional compensation.

*Appeal of Soledad Enterprises, Inc.*, ASBCA Nos. 20376, 20423 to 20426, 77–2 BCA ¶ 12,552 at No. 20425 (April 29, 1977).

We must digress for a moment to explain termination for convenience and its constructive application. Direct convenience termination is provided for in the clause in plaintiff's contract referred to by the ASBCA, and it is a standard term in federal procurement:

TERMINATION FOR CONVENIENCE OF THE GOVERNMENT

The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the best interest of the Government. If this contract is for supplies and is so terminated, the Contractor shall be compensated in accordance with ASPR Section VIII, in effect on this contract's date. To the extent that this contract is for services and is so terminated, the Government shall be liable only for payment in accordance with the payment provisions of this contract for services rendered prior to the effective date of termination.

The clause is intended to enable the contracting officer to stop or curtail a contractor's performance without involving the government in a breach that would render it liable for the contractor's anticipatory profits. Constructive resort to the clause, as was had by the ASBCA in this case, occurs in situations in which the government has stopped or curtailed a contractor's performance for reasons that turn out to be questionable or invalid. Constructively, the clause can justify the government's actions, avoid breach and limit liability. This springs from a decision of the Supreme Court that actions by a contracting party may be supported at a later date by any reason that could have been advanced at the time of the actions, even though the party was not then aware of it. *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925).

Returning to the case before us, the ASBCA's implicit conclusion that the Navy could, by invoking the clause, have had a convenience termination of plaintiff's pest control services at the time that it diverted that work to Public Works, allowed the ASBCA to justify the Navy's diversion con-

structively, at the time of litigation. And since the Navy had never turned to Soledad for such services, there were no incurred charges to pay off.

On appeal to this court, plaintiff's basic complaint is that the practical effect of this decision of the ASBCA is to exculpate the government completely. The government was allowed to walk away from plaintiff's contract with impunity. Plaintiff contends: (1) that the requirements aspect of its contract required that it receive 100 percent of defendant's pest control business, not 0 percent as it happened, and (2) that the doctrine of constructive termination for convenience should not be allowed to render this requirement meaningless. Defendant responds: (1) that the contract actually was of the indefinite quantities type, allowing the Navy to order a null amount, and (2) even if the contract was for requirements, that constructive termination is available as a valid excuse for non-performance nevertheless.

█ The primary issue in this appeal, raised squarely by the facts before us, is the coverage of the government's termination for convenience clause. The ASBCA did not question but that it was available to the government but we note that *Nesbitt v. United States*, 170 Ct.Cl. 666, 345 F.2d 583 (1965), *cert. denied*, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966), on which the ASBCA placed its principal reliance, was a very different case. *Nesbitt* involved the government's dilemma with a contractor who had agreed to service the government's needs but then, after the contract award, refused to meet them. *Id.* at 670 n.3, 345 F.2d at 586 n.3. It is far from clear that this court's recognition that the government may terminate for convenience in such a circumstance should be extended to the present facts, where termination was invoked to take advantage of a price that the government had known about at the award date and where the contractor, Soledad, remained at all times ready and willing to perform as per its agreement. Further, plaintiff's complaint is serious that the effect of the ASBCA's constructive use of

termination for convenience has been to allow the government to walk away from all of its contractual obligations. We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void, and we question if the government's termination for convenience clause should be construed that broadly. Since these issues are of great importance in the field of government contracts, they will receive close attention.

Before reaching these questions, however, it is necessary to address several preliminary issues.

## II

A contention of the government that would forestall any further argument is its assertion that its contract with Soledad was not of the requirements type but was only for an indefinite quantity of pest control. Thus, defendant alleges, the Navy's diversion of work to Public Works was allowed by the contract. This would mean that there was no breach, and it would render unnecessary any consideration of the ASBCA's resort to constructive termination for convenience to justify the diversion.

█ The ASBCA made no ruling on the type of contract that it had before it, and so this court must make the determination as an original matter. In so doing, however, we bear several important principles in mind. First, we recognize that we sit, for Wunderlich Act cases, as a court of limited review and are bound by the standards set out in the Act. 41 U.S.C. §§ 321 and 322. Thus we feel constrained to make no determination as an original matter that we could not make as a court of review in a case that properly presented the issue. Therefore, in determining whether the contract between Soledad and the Navy was for requirements or for an indefinite quantity, we will restrict our attention only to (1) the text of the contract itself, for contract construction is a matter of law that is always within our power, and (2) facts that are so well supported by the record that

contrary findings would not be supportable. As we have said:

> [W]here the evidence is disputed but it is of such a nature that * * * the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues; otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the Board formally decide a fact which legally can be decided in only one way.

*Maxwell Dynamometer Co. v. United States*, 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967); *Koppers Co. v. United States*, 186 Ct.Cl. 142, 405 F.2d 554 (1968); *Dittmore-Freimuth Corp. v. United States*, 182 Ct.Cl. 507, 390 F.2d 664 (1968). The second major principle is that we assume that the parties intended that a binding contract be formed. Thus, any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract. *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855 (1978), and cases cited therein; *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972 (1965), and cases cited therein.

The only pertinent terms[1] are the item from the bid solicitation, which specified "Item 8—Unit price per work authorization for rodent and pest control in accordance with the specifications, based on an estimated one work authorization per month," and the entry on plaintiff's bid response, filed on the appropriate standard form, which acknowledged the estimate, the call basis of each order and which fixed the price per call at $500. Our question is whether it is implicit in these terms, or in the circumstances surrounding the formation of the contract, that the Navy promised to give all of its work authorizations to Soledad or whether the Navy could use other contractors, too.

▇ Looking just at the contract terms, we note that they must fit into one of the three possible types of supply contracts: those for a definite quantity, those for an indefinite quantity and those for requirements. *Mason v. United States*, 222 Ct.Cl. 436, 444, 615 F.2d 1343, 1347 (1980). With contracts for a definite quantity, the promises and obligations flowing from each party to the other define both the minimum and maximum performances of each and furnish the consideration from each party that courts require for enforceability. With indefinite quantities contracts, however, the buyer's promise specifically is uncertain, and such a contract would fail for lack of consideration if it did not contain a minimum quantity term. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923); *Mason*, 222 Ct.Cl. at 443 n.5, 615 F.2d at 1346 n.5; Gavin, *Government Requirements Contracts*, 5 Pub.Cont.L.J. 234, 240–44 (1972) [hereinafter *Gavin*]. Without an obligatory minimum quantity, the buyer would be allowed to order nothing, rendering its obligations illusory and, therefore, unenforceable. Requirements contracts also lack a promise from the buyer to order a specific amount, but consideration is furnished, nevertheless, by the buyer's promise to turn to the seller for all such requirements as do develop. Such contracts clearly are enforceable on that basis. *Brawley v. United States*, 96 U.S. 168, 172, 24 L.Ed. 622 (1878); *Shader Contractors, Inc. v. United States*, 149 Ct.Cl. 535, 540–43, 276 F.2d 1, 4–6 (1960); *Gavin* at 244–48. The entitlement of the seller to *all* of the buyer's requirements is the key, for if the buyer were able to turn elsewhere for some of its needs, then the

---

1. These are the specific references to the one item of the 12-item contract that is under dispute. Separate evaluation of the parties' relationships for various of the items is warranted by the very discrete natures of the tasks and by the different bases on which those tasks were to be performed. "Two performances promised by [one party] may be paired separately with two considerations promised in return, each performance being the full agreed equivalent of one of the stated considerations; and they may be so separate in character that we have two separate sets of reciprocal rights and duties, created by a single contract." 3A Corbin on Contracts § 696 (1963).

contract would not be distinguishable from an indefinite quantities contract with no stated minimum, unenforceable as we have stated.

■ Under these principles, the contract before us is easily interpreted. We note that the Navy agreed to authorize pest control work, that plaintiff agreed to perform it and that there was an acknowledged estimate that one call would be made per month. A definite quantity certainly is not contemplated here, so the contract is not of that type. Just as certainly, the estimate is not stated in such terms as could be construed as an obligatory minimum, and so we could not hold that this contract is for an indefinite quantity without destroying it as lacking consideration. Thus, we must and do conclude that plaintiff's contract is for the Navy's requirements.

The facts, as they plainly appear from the record before us, support this conclusion completely. From the circumstances surrounding the bid solicitation and the contract, and from the testimony and the exhibits introduced at the ASBCA trial, it is clear that the Navy wanted someone, a single contractor, to take on the comprehensive task of providing grounds maintenance and refuse removal at the six housing projects covered by the contract.[2] The Navy wanted to have to deal with only one contractor and executed a contract that was intended to obligate that one contractor for all of the tasks needed.[3]

### III

■ Also at the outset of the discussion of this case, we must say that it is not a case merely for construing a federal regulation to see if a plaintiff has a monetary claim. Most of the cases in this court turn on specific statutes or regulations that do or do not afford plaintiffs the monetary relief they seek, and this court is cautious in such cases to examine the statutes and regulations carefully to make sure that the plaintiffs are entitled to the recovery they claim. Congress creates rights and entitlements, or waives its sovereign immunity, as it sees fit, and this court will award judgment only where the statute or regulation relied upon so provides, directly or by express implication. *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (1967). *See United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

■ It is a different situation in the field of contracts, however.[4] The government contracts as does a private person, under the broad dictates of the common law. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935). While it is true that the government has the power to abrogate common-law contract doctrines by specific legislation, *see, e.g.,* the First War Powers Act, 1941, Pub.L.No.77–354, 55 Stat. 838 (power to the President to authorize agencies to enter into contracts "without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts," 55 Stat. 839); U.C.C. § 2–209(1), "Modification, Rescission and Waiver" (contractual modifications within Article 2 do not need consideration), the general rule must be that common-law contract doctrines limit the government's power to contract just as they limit the power of any private person. Thus, the government's entry into the field of con-

---

**2.** Note that the 12 items of the contract were to be awarded on an "all or none basis," *see* paragraph 3 of this opinion, evidently meaning that only one contractor was desired.

**3.** We also note that the standard form that replaced the one on which plaintiff was required to submit its bid specifically states that it is for requirements.

**4.** *Eastport's* discussion of the two general types of monetary claims in this court specifically is limited to non-contractual claims. 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). *Eastport* dealt only with claims that were statutory- or regulatory-based.

tracts is not like its selective creation of rights and entitlements in other fields. As we have explained, statutes and regulations in other fields circumscribe a prospective plaintiff's recovery strictly. If, however, a plaintiff's action or recovery purportedly is limited by a contractual term, that limitation will stand only if allowable under the doctrines of contract. Indeed, the Supreme Court has held as early as 1923 that the government may not, by simple contract, reserve to itself a power that exceeds that which a private person may have. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (government may not reserve to itself a right of non-performance without destroying the contract). And it does not matter that a contract term is mandated by federal procurement regulation. In the field of contracts, it is only by specific legislation that the government may trespass the bounds of general contract doctrines. Therefore, this court will read the termination for convenience clause in the contract in this case as it would read any contract term and give effect to it or deny effect to it as dictated by the general law.

## IV

The coverage of the government's termination for convenience clause is now squarely at issue. Since we have concluded that the Navy indeed was obligated to give all of its pest control requirements to Soledad, and since it is stipulated that the Navy gave Soledad none, we are confronted directly with the ASBCA's use of constructive termination for convenience to allow the Navy not to continue with that obligation.[5] And since the constructive use of convenience termination is directly dependent, under *College Point Boat Corp.*, upon the availability of that ground at the time of the disputed actions, the ultimate question that must be asked is whether, at the time that the Navy first gave pest control work

to Public Works, it could have had a convenience termination of that item under the clause in Soledad's contract. If the clause could have been invoked at that time, then the ASBCA was correct and the Navy's failure to use Soledad is excused. If not, however, then plaintiff must prevail because a breach was committed.

The full background and ramifications of the ASBCA's use of convenience termination as an exculpatory clause require a discussion over several parts. As we shall explain in Part A, below, the convenience termination clause developed as a wartime concept, and it was a way for the government to avoid the continuance of contracts that the rapid changes of war, or the war's end, had made useless or senseless. *See* Nash & Cibinic, Federal Procurement Law 1104–07 (3d ed. 1980) [hereinafter *Nash & Cibinic*]. The government could halt a contractor's performance and settle with the contractor for the progress made. As such, termination for convenience functioned to allocate to the contractor the risk of losing the benefit of its full performance if full performance became unneeded. Even when termination for convenience was imported into peacetime military and civilian procurement, only 20 or 30 years ago, and receiving its almost universal application only from 1967, *Nash & Cibinic* at 1107, the basic idea remained constant that convenience termination was an allocation of the risk of changed conditions. A long line of cases in this court bears this out. Part B of this section will examine convenience termination in the absence of changed conditions, for purely exculpatory purposes. This is the latest development, dating only from 1974,[6] and it is this use of the clause that the government presses in the case before us. As we shall explain fully, such a use is not supported by the legal theory underlying the clause nor by the clause's history, and it has caused great concern among commentators and members of the bar. While

---

5. As this is a question of law, the ASBCA's determination of course is not binding on this court. 41 U.S.C. § 322 (1976). *Cf.* 41 U.S.C. § 609(b) (Supp.1981) (analogous provision for the Contract Disputes Act of 1978).

6. *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974).

it is plain that parties to a contract may freely agree to various forms of risk allocation, as with the basic use of the termination for convenience clause, it is just as clear that parties may not agree that one or both may walk away from all obligations without rendering the contract unenforceable. Part C explores this last point, that the availability of convenience termination for free exculpation cuts straight to whether the government's promises can be made to bind it. The question is whether a broad construction of the termination for convenience clause would make the government's promises only illusory.

For the purposes of this entire section, we will apply part of what we said at the beginning of the last section, that we will not construe the termination for convenience clause in such a way that any contract that contains it is overpowered if there is an alternative reading of the clause that allows such contracts to be upheld.

### A. The History of the Termination for Convenience Clause

The concept that the government may, under certain circumstances, terminate a contract and settle with the contractor for the part performed dates from the winding down of military procurement after the Civil War. It originated in the reasonable recognition that continuing with wartime contracts after the war was over clearly was against the public interest. Where the circumstances of the contract had changed so dramatically, the government had to have the power to halt the contractor's performance and settle.

The case that first articulated this idea, and which generally is credited as providing the basic legal theory to support the modern termination for convenience clause, is *United States v. Corliss Steam-Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1876). *See Nash & Cibinic* at 1104; Moss & Gantt, *A Steam Engine and Contract Termination Settlement Procedures*, 8 Pub.Cont.L.J. 188 (1976). In *Corliss*, the government appealed a judgment of this court[7] upholding a settlement agreement between the Navy

and Corliss concerning two contracts that remained uncompleted when the Civil War ended. It was the government's position on appeal, as it had been in this court, that the Navy did not have the power to bind the United States to a settlement. Indeed, Congress had passed legislation that money was not to be appropriated to pay Corliss until there was an investigation into the agreement to see if the amount could be reduced. The Supreme Court affirmed, however, holding that the Secretary of the Navy necessarily had the power to settle with contractors when the exigencies of war, or its termination, demanded. It said:

> Contracts for the armament and equipment of vessels of war may, and generally do, require numerous modifications in the progress of the work, where that work requires years for its completion. With the improvements constantly made in ship-building and steam-machinery and in arms, some parts originally contracted for may have to be abandoned, and other parts substituted; and it would be of serious detriment to the public service if the power of the head of the Navy Department did not extend to providing for all such possible contingencies by modification or suspension of the contracts, and settlement with the contractors.

91 U.S. at 323, 23 L.Ed. 397. Clearly, *Corliss* establishes as basic law and policy that procuring agencies must have the power to settle contracts that have been subjected to great changes in expectations.

During World War I, the *Corliss* doctrine expanded into a very important part of military procurement. Included here are two examples of this expansion, a statute and a contract clause, each plainly reflecting the idea expressed by the Supreme Court in *Corliss* that the government must be able to settle with contractors when the circumstances of war require. In 1917, Congress passed the Urgent Deficiency Appropriation Act, Pub.L.No.65-23, 40 Stat. 182, responding to a two-pronged concern that the government not have to remain

7. ·Reported in 10 Ct.Cl. 494 (1874).

committed for obsolete items during the war or for stockpiles of items at the war's end. vom Baur, *Fifty Years of Government Contract Law*, 29 Fed.B.J. 305, 313 (1970). The Act authorized the President, until 6 months after a final treaty of peace, 40 Stat. 183, "[t]o modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material." 40 Stat. 182. In such case, the government was to make "just compensation therefor." 40 Stat. 183. The example of a specially drafted contract clause is from *Davis Sewing Machine Co. v. United States*, 60 Ct.Cl. 201 (1925), aff'd, 273 U.S. 324, 47 S.Ct. 352, 71 L.Ed. 662 (1927). *Davis Sewing Machine* involved a contract for the procurement of Very pistols, which provided:

> *Termination*—This contract being necessitated by a state of war now existing, it is desirable and expedient that provision be made for its cancellation upon fair and equitable terms in the event of the termination or limitation of the war, or if in anticipation thereof or because of changes in methods of warfare the Chief of Ordnance should be of the opinion that the completion of this contract has become unnecessary. It is therefore provided that any time, and from time to time, during the currency of this contract, the Chief of Ordnance may for any of the causes above stated notify the contractor that any part or parts of the articles then remaining undelivered shall not be manufactured or delivered.

*Id.* at 203. As with the Urgent Deficiency Appropriation Act, this contract provided that the government would settle with the contractor, specifically for accrued costs and just compensation. *Id.* It is important that both of these examples make clear that convenience termination, as it was developing, was intended just to handle changed conditions, relieving the government of the risk of receiving obsolete or useless goods. The risk was shifted to the contractor that it could lose the full benefit of its expectations if circumstances changed too radically.

For World War II, the *Corliss* concept was embodied in a mandatory termination clause for fixed-price supply contracts, the direct predecessor of the modern termination for convenience clause:

> *Termination for the convenience of the Government.* (a) The Government may, at any time, terminate this contract, in whole or in part by a notice in writing from the Contracting Officer to the Contractor that the contract is terminated under this Article.

10 C.F.R. § 81.324 (Cum.Supp.1938–43). Also provided for is payment to the contractor of accrued costs and a reasonable portion of anticipated profit. *Id.* It will be noted immediately that this clause seems to be worded for very broad availability. The power to terminate "at any time * * * in whole or in part" is much broader, for example, than the conditions recited in the World War I clause quoted above. It must be understood, however, that its use was restricted to the war period, *Nash & Cibinic* at 1106, and clearly was a response to wartime emergency conditions. Despite the broad wording, the World War II clause still was to allocate the risk of changed circumstances. As Congress said, when it enacted the Contract Settlement Act of 1944, Pub.L.No.78–395, 58 Stat. 649, to provide an administrative structure for winding down World War II procurement, the main objectives of settlement procedures were "to facilitate maximum war production during the war, and to expedite reconversion from war production to civilian production as war conditions permit [and] to assure to prime contractors and subcontractors, small and large, speedy and equitable final settlement of claims under terminated war contracts * * *." *Id.* Contractors risked losing the benefits of full performance but only for the exigencies of war.

The next major steps in the development of termination for convenience occurred in 1950, when the concept first was applied to peacetime military procurement, and in 1967, when it first was given the general applicability to peacetime military and civilian procurement that it has today. *Nash & Cibinic* at 1107. It can readily be understood that these were very significant

shifts, entailing a great potential for difficulty in adapting the concept to new settings. The modern formulation of the clause uses the same broad language that was used in World War II (see section I of this opinion for the clause that is in dispute in this case) but there was, and is, not the same kind of emergency situation. From the *Corliss* decision in 1876 to the last use of the World War II convenience termination clause in early 1944, the legal basis of the government's power had always been that the great and unpredictable circumstances of war necessitated some ability to halt useless contracts and settle with ·the contractors. War was now absent.

The response in this court was to rely on the risk allocation nature of the concept and to allow termination for convenience only when the expectations of the parties had been subjected to a substantial change. The contractor risked losing the full benefit of his performance if something occurred, apart from the bargain and the expectations of the parties, that made continuance of the contract clearly inadvisable. The history of cases in this court demonstrates this. *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (irregularity in the bid award); *Brown & Son Elec. Co. v. United States*, 163 Ct.Cl. 465, 325 F.2d 446 (1963) (irregularity in bid award); *Nesbitt v. United States*, 170 Ct.Cl. 666, 345 F.2d 583 (1965), *cert. denied*, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966) (refusal of contractor to meet requirements); *Warren Bros. Roads Co. v. United States*, 173 Ct.Cl. 714, 355 F.2d 612 (1965) (irregularity in the bid award); *Coastal Cargo Co. v. United States*, 173 Ct.Cl. 259, 351 F.2d 1004 (1965) (irregularity in bid award); *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702 (1968) (plaintiff under investigation by Senate for procurement irregularities, and in technical default); *Nolan Bros. v. United States*, 186 Ct.Cl. 602, 405 F.2d 1250 (1969) (physical changes at site made performance impossible); *G. C. Casebolt Co. v. United States*, 190 Ct.Cl. 783, 421 F.2d 710 (1970) (irregularity in the bid award).

These cases recognized that the termination for convenience clause was only to be applied where there was some change from the parties' original bargain and was not to be applied as broadly as an untutored reading of the words might suggest. Especially, we point to *Nesbitt*, which quoted the "from time to time" wording of the clause but specified in a footnote that the plaintiff's failure to perform in that case undoubtedly was a proper circumstance for the clause's use, 170 Ct.Cl. at 670 and 670 n.3, 345 F.2d at 585–86 and 586 n.3; to *Nolan*, which said that it was "entirely reasonable * * * [to invoke the clause ·for] a post-contract recognition that the job is impossible or too difficult to perform or too costly for the Government if pushed through to its conclusion," 186 Ct.Cl. at 606, 405 F.2d at 1253; to *Casebolt*, where the court specifically recognized its obligation to see if the government's directive to terminate the contract in that case "could lawfully come under that clause," 190 Ct.Cl. at 786, 421 F.2d at 712; and to *Reiner*, in which the court spoke in its broadest terms about the availability of the clause, that it could be used in a "host of variable and unspecified situations" and at the will of the government, and still inquired into the propriety of its use on the facts before it. 163 Ct.Cl. at 390–91, 325 F.2d at 442–43. The message in those cases is clear that termination for convenience was to allocate the risk of a change in the circumstances of the bargain or in the expectations of the parties.

### B. Termination for Convenience for Exculpation

In 1974, this court first allowed termination for convenience for a different reason than risk allocation. The case, *Colonial Metals v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), involved no changed conditions, only the government's decision to terminate the contractor and remake the contract with someone else, for a reason that was known or should have been known to the government *before* the contract was awarded.

*Colonial Metals* dealt with a supply contract for a definite quantity of copper, with a termination for convenience clause much like the one now in issue.[8] Plaintiff's bid had been higher than what would have been charged by a primary source supplier, quotations for which regularly appear in the *Wall Street Journal* and trade papers, *id.* at 329, 494 F.2d at 1360, because plaintiff was a secondary source. The government contracted with plaintiff, nevertheless, but then decided soon after to remake the contract with primary sources. Plaintiff was terminated for convenience before any performance. Although many aspects of the government's decision-making were unclear, the court found that it was certain, "as the Board found, [that] the Government terminated to get a better price from another source, a price which the Government throughout knew or ought to have known was readily available." *Id.* at 329–30, 494 F.2d at 1360.

In the *Colonial Metals* opinion, by sustaining the government's termination for convenience, this court made a clear break with all of the prior law on the subject. The requirement of changed conditions specifically was rejected:

> Termination to buy elsewhere at a cheaper price is essentially such a termination as has repeatedly been approved. The added element that the contracting officer knew of the better price elsewhere when he awarded the contract to plaintiff * * * means only that the contract was awarded improvidently and does not narrow the right to terminate. The clause is not designed to perpetuate error, but to permit its rectification.

> Termination for convenience is as available for contracts improvident in their origin as for contracts which supervening events show to be onerous or unprofitable for the Government.

*Id.* at 331, 494 F.2d at 1361. Termination for convenience was allowed to be used as an exculpatory clause, available at the unlimited discretion of the contracting officer. The broad wording of the convenience termination clause was applied without regard to the history of emergency, wartime situations in which the words were formulated or to the legal theory of risk allocation as it has dated from *Corliss*.

The commentary on *Colonial Metals* has not been favorable. Professors Nash and Cibinic, on the part of the opinion that says that "[t]ermination to buy elsewhere at a cheaper price is essentially such a termination as has repeatedly been approved," note that there are no authorities cited and assert that there simply are none to cite, except for an unpublished Comptroller General opinion. *Nash & Cibinic* at 1112. Other commentators note that the effect of *Colonial Metals* is to put contractors "in the untenable position of being subject to termination and loss of the benefit of the sale when the market falls but being saddled with a loss when the reverse occurs." Perlman & Goodrich, *Termination for Convenience Settlements—The Government's Limited Payment for Cancellation of Contracts*, 10 Pub.Cont.L.J. 1, 6 (1978). They assert that this result is unfair, *id.*, but find it inescapable after *Colonial Metals*, because "[i]t can only be concluded that there are virtually no limitations on the Government's right to terminate for convenience." *Id.* at 7. Another writer has gone so far as to draft a hypothetical telegram for convenience termination that begins: "Your contract with me * * * is hereby terminated because you are in default, I think; in any event you are tardy in making progress, probably. Even if neither conclusion is true, said contract is still terminated because it suits me to do so." Newman, *The Beginning of the End—The Encroachment of Federal Contract Termination Practices,*

---

**8.** The clause in the *Colonial Metals* contract was incorporated by reference to ASPR 7–103.-21(c) (April 1966), 32 CFR §§ 7.103–21(c), 8.701(a) (1970) (Termination for Convenience of the Government, April 1966). It provides in part as follows: "(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government."

33 Bus.Law. 2143, 2143 (1978). It is the consensus that *Colonial Metals* is a far-reaching decision of major concern, imposing an onerous burden on anyone who would deal with the government. *Nash & Cibinic* at 1105; Note, *Tying Together Termination for Convenience in Government Contracts*, 7 Pepperdine L.Rev. 711, 721–22 (1980) (hereinafter *Pepperdine*).

*Colonial Metals* appears to be an aberration in the precedents of the court. The case came before the court on defendant's uncontested motion to adopt the trial judge's report as the basis for its judgment. Plaintiff had lost before the trial judge but did not request review, and the motion was granted, without oral argument. The attention of the court was in no way directed, as it is now, to the fundamental issues so important in the pending case, and plaintiff's failure to raise a contest dilutes the decision of much weight as precedent that we otherwise would accord it.[9] It is clear, however, that *Colonial Metals* marked a dramatic departure from the development of convenience termination as a method of risk allocation. It established a new reading of the ·clause, convenience termination for exculpation, and it is this reading that the government contends for in the case now before us. It is the only decision of this court in which a plaintiff was denied recovery after convenience termination that was based on knowledge acquired before the contract was awarded.

Were we to have only the historical argument before us, however, a decision on the breadth of the termination for convenience clause would be very difficult. *Colonial Metals* may have broken with historical development but it is, of course, within the power of contracting parties to evolve new types of agreements as long as the basic tenets of contract law are followed. As *Colonial Metals* itself put it, "[i]t may well

be * * * that the Government does not promote confidence in its procurement process when it terminates a contract and deprives the contractor of the profits of the bargain, for reasons which were known at the time of the award." 204 Ct.Cl. at 330, 494 F.2d at 1360. But this alone is not enough to say that such a power of termination cannot be had by the government. The answer to this, however, is that the historical argument is not the only one against convenience termination for exculpation. When a party seeks to restrict to itself an unlimited right to escape its promises, as termination on knowledge acquired before the contract award surely is, it risks violating one of contract law's most fundamental principles, that all contracts must be supported by consideration. *Nash & Cibinic* at 1115.

### C. *The Requirement of Consideration*

It is beyond dispute that the government must furnish consideration for its contractual promises as must any private party. The Supreme Court so held in *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923), when it invalidated a contract because it lacked consideration from the government, and this court has spelled out with particularity the forms of consideration generally required from the government in using its various types of supply contracts. *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343 (1980). *See also* Kelly, *The Concept of Consideration in Government Contracts*, 10 JAG L.Rev. 20 (Jan.-Feb.1968).

As we explained in section II of this opinion, it is the very essence of a requirements contract, such as plaintiff had with the government in this case, that the buyer agree to turn to the supplier for *all* of its needs. If there is not a commitment for all needs, then the relation is not different from an indefinite quantities contract with

---

**9.** *Colonial Metals* has only been cited once by this court and then not for any proposition made an issue in the case we must now decide. *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (award to another contractor after termination of plain-

tiff's contract is insufficient to show bad faith absent proof of malice or conspiracy against plaintiff). The decision has played an important part in ASBCA decisions, however. *See* Note, *Tying Together Termination for Convenience in Government Contracts*, 7 Pepperdine L.Rev. 711, 721 n.56 (1980).

no required minimum, the very type of relation that the Supreme Court held in *Willard, Sutherland & Co.*, could not be a contract. See section II of this opinion.

■ The effect of the ASBCA's decision in the case before us, however, was to allow the government not to give Soledad *any* of its needs, to walk away from its cardinal contractual obligation. It is hornbook law, as the government concedes in its supplemental brief, that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract.

> A promise to buy such a quantity of goods as the buyer may thereafter order, or to take goods in such quantities "as may be desired," or as the buyer "may want" is no consideration since the buyer may refrain from buying at his option and do so without incurring legal detriment himself or benefiting the other party.

1 S. Williston, A Treatise on the Law of Contracts § 104 (3d ed. 1957). According to Corbin:

> If what appears to be a promise is an illusion, there is no promise; like the mirage of the desert with its vision of flowing water which yet lets the traveller die of thirst, there is nothing there. By the phrase "illusory promise" is meant words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will, just as it would have been had he said no words at all.

1 Corbin on Contracts § 145 (1963). It must be concluded, then, that the government's promise to turn to Soledad for all of its pest control work, if it was also implicit in the termination for convenience clause that the government could give Soledad none, was no promise at all. The contract would thus fail.

The approach of the Restatement (Second) of Contracts is to consider all of the possible performances under a contract's terms as alternative performances, and to require that each alternative be itself a sufficient obligation to support the contract. In this way, it is ensured that each party necessarily will end up performing in a way that reflects some binding obligation. "A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless * * * each of the alternative performances would have been consideration if it alone had been bargained for * * *." Restatement (Second) of Contracts § 77 (1979). Illustrations 1 and 4 to this section resemble the instant case:

> 1. A offers to deliver to B at $2 a bushel as many bushels of wheat * * * as B may choose to order within the next 30 days. B accepts, agreeing to buy at that price as much as he shall order from A within that time. B's acceptance involves no promise by him, and is not consideration.

> 4. A agrees to sell and B to buy between 400 and 600 tons of fertilizer in installments as ordered by B, A reserving the right to terminate the agreement at any time without notice. B's promise is without consideration. [Note that this illustration was taken from an old case which regarded consideration as flowing from the promisee to the promisor. B's promise is without consideration because none flowed from A due to A's right to terminate.]

The possible alternative of non-performance is unacceptable. Thus the ASBCA's view of the government's power to terminate for convenience, allowing unlimited exculpation, is too broad.

It has been argued, however, that the procedures that the government must follow when it terminates for convenience do not allow it to walk flatly away, and that the government does give consideration to the extent that it is not completely free of obligations. *Pepperdine* at 727. To use the language of the Restatement section quoted above, this is an assertion that the government's alternative performance of exculpatory convenience termination still involves promises that would be sufficient if they

alone had been bargained for. This would mean that each of the government's two alternatives, performance according to the contract or termination under certain sufficient procedures, would be enough to bind the government, and the contract would not be jeopardized. Specifically, the asserted alternative measures of consideration contained in the procedures for terminating a services contract, as in this case, are: (1) an obligation to give notice of convenience termination and (2) an obligation to pay for services rendered.

On the facts of our case, however, if the ASBCA's free use of exculpatory convenience termination were allowed, these asserted obligations still could not provide an obligation sufficient to support the alternative performance of exculpatory termination. (1) On the point of notice, we need only note that convenience termination in this case was constructive, because the procedures for invoking the clause were not originally followed. There is never notice in a constructive case, and so it plainly cannot be the binding obligation that would supply consideration.[10] (2) On the point of paying for services rendered, it seems that requiring only that the government pay for how far it has gone gives the government the possibility of transforming virtually any contract into one for an indefinite quantity, with no required minimum term. We have said repeatedly in this opinion that such an arrangement fails. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923).

Thus we must conclude that none of the termination procedures entails an alternative performance that would bind the government to anything that would be sufficient for consideration if it alone had been bargained for. Termination for convenience for exculpation, then, as the ASBCA allowed in this case, if there were no restrictions on its use other than the termination procedures, would vitiate the consider-

ation normally furnished by the government for a requirements contract without substituting any other sufficient obligation. Such a reading of the clause would destroy the contract.

■ The government argues further, however, that it is a sufficient fetter on convenience termination that the contracting officer must determine in good faith that termination would be "in the best interest of the Government." Thus, the government cannot invoke the clause where it would not be in its interest to do so or where the contracting officer lacks good faith in making the determination of interest. On the first point, it seems hardly sufficient for the government to promise not to do anything that would be against its own interest. This merely is promising only to do whatever suits it. On the second, we note that the government, unlike private parties, is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary. *Librach v. United States*, 147 Ct.Cl. 605 (1959). As this court has phrased it, in a case specifically involving convenience termination:

> it requires "well-nigh irrefragable proof" to induce the court to abandon the presumption of good faith dealing. *Knotts v. United States*, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954).

In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some *specific intent to injure the plaintiff.* Thus, in *Gadsden v. United States*, 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948), the court compared bad faith to actions which are "motivated alone by malice." In *Knotts, supra,* at 128 Ct.Cl. 500, 121 F.Supp. 636, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy * * * to get rid of plain-

---

**10.** Even if given, however, as in direct convenience termination cases, we would question whether it is sufficient to support a contract merely that one party promise to the other to tell him that he is walking away before he does

so. *But cf. Sylvan Crest Sand & Gravel Co. v. United States*, 150 F.2d 642 (2d Cir. 1945) (finding consideration in an implicit requirement to notify of cancellation within a "reasonable time").

tiff." Similarly, the court in *Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 222 (1942) found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach, supra,* at 147 Ct.Cl. 614, the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1301–02 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Thus, the government's obligation to act in good faith hardly functions as the meaningful obligation that it may be for private persons. Since good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff. It does not seem enough to support the government's claim for otherwise unlimited convenience termination for the government only to promise not to use it specifically to damage the contractor.

The government also argues, as its final assertion, that its power to terminate for convenience is subject to sufficient limitation in that it recognizes that it cannot invoke the clause when it would be a clear abuse of discretion to do so. *National Factors, Inc. v. United States,* 204 Ct.Cl. 98, 492 F.2d 1383 (1974). This is an argument that the reservation of a power to "terminate within my discretion" involves an obligation sufficient to uphold a contract because discretion is limited. As soon as one wonders what those limits are, however, one realizes that this argument of the government puts the cart before the horse. Discretion, and its abuses, are concepts that depend for their very meanings on the existence of other limits. Discretionary matters are those about which the party having discretion may be flexible, within an otherwise legal agreement, and abuse occurs in the rare situations when something arises that seems to make that normal action unfair. As concepts that only exist *within* limits, they cannot *be* the limits, as the argument of the government suggests. If the government is correct that its power to terminate for convenience is unlimited except that its exercise cannot be an abuse of discretion, how could such an abuse ever take place? What limits are there to abuse? Abuse of discretion is a valuable doctrine to enable otherwise legal actions to be overturned if there seems some clear wrong nevertheless, but it is not applicable to actions that simply are not legal at all. It is bootstrapping to say that the government's claimed power of unlimited exculpation is saved by the limits on its discretion. Those limits must be derived from something else, but under the government's view there is nothing else.

In the last analysis, then, if the ASBCA's free use of convenience termination is adopted, the asserted restrictions on the government's termination power still would not provide an obligation that would satisfy the government's requirement of furnishing consideration. There are no sufficient termination procedures: (1) notice is not given in a constructive case and (2) paying for services rendered would result only in converting all contracts that contained the clause to ones for an indefinite quantity with no stated minimum. Also, the requirement of good faith is not sufficient because the government's presumption of good faith dealing is rebuttable only in the most extreme circumstances, when there is a specific intent to harm the contractor. And the government's obligation to avoid clear abuses of discretion is only an illusion. Without any other limits, the concept of discretion is meaningless. We must conclude that free termination for convenience is not supportable.

█ We have said in this opinion that we will not construe a contract clause in such a way that the contract is destroyed if there is an alternate reading that will uphold the contract. Accordingly we will not read the clause as freely as did the ASBCA and we restrict the availability of the clause to situations where the circumstances of the bargain or the expectations of the parties have changed sufficiently that the clause serves only to allocate risk. This avoids the mistake of *Colonial Metals* and restores the

meaning of the clause to what it had been from 1876 until it was changed by *Colonial Metals* in 1974. Of course, if the government were to change its convenience termination procedures in such a way that valid consideration was still furnished in an exculpation situation, by limiting its power to terminate in some way that would be consideration for the contract if it alone had been bargained for, then convenience termination for exculpatory purposes would also be proper.

## V

█ It remains only to summarize what this opinion does and what it does not do. We are not holding here that the government cannot settle with contractors on those contracts that the government needs to settle. The termination for convenience clause is a valuable and important aspect of federal procurement. It has a long history and is founded solidly on *Corliss* of 1876. Nor are we holding that the government cannot draft for itself some method of exculpation so long as it also binds itself to something that will support the contract. We hold in this opinion only that the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations.

In the case before us, the Navy had accepted Soledad's bid and had executed a contract knowing that another bid was lower. This contract bound the Navy to give to Soledad all of its pest control needs at the six housing projects covered. The Navy could not just walk away from this promise without making a mockery of the contract. It is nothing more than basic contract law that a power to terminate must be limited in some meaningful way, as measured by the requirement of consideration. The government has argued that there are no limits on its power to invoke termination for convenience. However, since the government's convenience termination procedures (giving notice and paying for services rendered), at least as applied to this case, also put no sufficient limits on the government, its unrestricted use of the clause cannot be correct. Any contract containing the clause, in the absence of something else to furnish consideration, would fail for the lack of any binding obligation. Therefore, we must read the termination for convenience clause in Soledad's contract to require some kind of change from the circumstances of the bargain or in the expectations of the parties. These are just the historical limits on the use of the clause as they have developed from *Corliss*.

█ On the facts as found by the ASBCA, at the time that the Navy first called Public Works to do the work that it had contracted with Soledad to have done, there were no changes from the circumstances of the bargain between the Navy and Soledad, or in their expectations. The Navy had known from the competitor's bids, before it made the contract with Soledad, that Soledad's price was high and that it could get pest control more cheaply elsewhere. The Navy contracted with Soledad anyway. The ASBCA erred in allowing constructive termination for convenience to excuse the Navy's diversion of business. Termination for convenience was not available to the Navy, and so the Navy's breach of Soledad's contract is unexcused.

Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted to the extent that we find that the contract was breached by defendant. This case is referred to the trial division, for further proceedings on the issue of damages, in accordance with this opinion and Rule 131(c)(2). Defendant filed a motion on March 19, 1981, to strike an affidavit by plaintiff. In view of our conclusion that the contract as a matter of law is a requirements contract, plaintiff's affidavit that he so considered it is immaterial and mooted. *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), to the extent that it is inconsistent with this opinion, is overruled. We cannot condone termination based on knowledge of a lower cost when that knowledge preceded award of the contract.

FRIEDMAN, Chief Judge, concurring:

As I understand the court's opinion, the court holds only that when the government enters into a requirements contract, knowing that it can obtain an item the contract covers for less than the contract price and intending to do so, there cannot be a constructive termination for convenience of the government when the government follows that course. On that basis, I join in the opinion.

DAVIS, Judge, concurring in the result:

Although I fully concur with the end-result of Judge Bennett's opinion—that a convenience termination clause could not be properly used to end this requirements contract where the Government knew, at the time it entered into the agreement, that it could obtain a better price from another person [1]—I cannot join in much of the opinion which seems to me unnecessarily broad (reaching out toward different cases not now before us) and, on some points, incorrect. I do agree that (a) the contract was of the requirements type, (b) there is, for this case, no statute or regulation absolving this contract from the normal requirement of being supported by consideration, (c) if the convenience-termination clause is used, *in this instance of pre-existing knowledge*, as the defendant would do, then this requirements contract would be without proper consideration, (d) accordingly, the contract should be construed otherwise in order to sustain it as valid, and (e) *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), should be overruled. That is sufficient to reach the correct result, and nothing else need be said in this case.

There is, however, much else in Judge Bennett's opinion—unnecessary discussion which I cannot accept. For one thing, I do not agree at all with the suggestion that the scope of the convenience-termination

clause is narrower today than during World War II. In my view, the type of emergency procurement conditions experienced in World War II can be, and not infrequently are, present in the post-war period—and the convenience-termination clause was deliberately continued into the present era for that precise reason.

Second, I do not agree that "abuse of discretion" is an inadequate or unsatisfactory general standard for gauging the contracting officer's use of the termination clause. The clause in the contract before us calls for use of the termination device only "when it is in the best interest of the Government." That is comparable to the "public interest" standard often used to control administrative rulings in the regulatory field, and is likewise parallel to the criterion by which several other procurement decisions are measured.[2] In the present instance, I would have no difficulty in holding that it was an abuse of discretion to use the clause to end the contract because lower prices could be obtained elsewhere when the contracting officer already knew that very fact before he consummated the contract with plaintiff.

Third, I do not agree that "bad faith" is as narrow as Judge Bennett says it is. In *Kalvar, supra*—the case he cites—this court said, without in any way seeking to modify our prior holdings: " * * * many of our prior decisions seem implicitly to accept the equivalence of bad faith, abuse of discretion, and gross error." 211 Ct.Cl. at 198, note 1, 543 F.2d at 1301, note 1. *Kalvar* expressly held that that contractor had failed to show either bad faith or abuse of discretion (*see* footnote 2, *supra*) and the limited definition of bad faith quoted in the opinion gave merely one aspect of the concept of "bad faith." Here, too, I would be ready to hold that a contracting officer acted in bad faith when he terminated a

---

1. This lower price is the only reason given for defendant's refusing to order pest-control services from plaintiff.

2. In *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 197, 543 F.2d 1298, 1301 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89

(1977), this court expressly asked the parties, in a convenience-termination case, to discuss "bad faith or a clear abuse of discretion," and then found that that plaintiff had "failed to make a sufficient showing of bad faith or abuse of discretion by the Government."

contract for convenience to get a better price of which he had full knowledge (and which was available) at the time when he deliberately entered into the contract with plaintiff.

Finally, I consider it wrong and a mistake to intimate, even provisionally or gratuitously, that the convenience termination clause cannot be utilized when a better price appears *after* the contract is made. As Judge Bennett recognizes, the prime purpose of the clause is to take account of changed conditions occurring after the agreement is consummated, and a better price appearing at that time appears to be such a change in significant conditions. Yet his opinion cites, with apparent acquiescence or approval, extra-judicial commentary suggesting that a post-contract change in the price situation should not be enough to trigger the convenience termination clause.

As I have already pointed out, all the portions of the opinion to which I object are unnecessary to the result. At very best they will prove troublesome in future cases which are not now before us.

NICHOLS, Judge, concurring in the result:

I concur in the result, but I think the court takes a needlessly circuitous route to a destination we all agree on. In getting there, it tosses off needlessly sweeping dicta.

As regards the doctrine of consideration, the court puts aside the other 11 items and regards the "requirements" clause for pest control if needed, as if it stood alone. I am not sure a provision for use of pest control services at the government's sole election is unsupported by consideration if other contract undertakings are not similarly avoidable on the government side. Moreover, a termination of a contract for convenience is valid only in the absence of bad faith or a clear abuse of discretion. *National Factors, Inc. v. United States*, 204 Ct.Cl. 98, 492 F.2d 1383 (1974). Here we have a putative or "constructive" termination only, and the court will not suppose such a termination as

exonerating defendant from all its commitments, if the act would be an abuse of discretion. If consideration is furnished, the court will not inquire into its adequacy. *Mills v. United States*, 187 Ct.Cl. 696, 410 F.2d 767 (1969).

As the termination cannot be postulated if it would be an abuse of discretion, I turn to what would constitute the abuse. We need not consider cases not before the court. Here the government stated it would evaluate bids on all the items as an entirety and make the award only to one who had bid on all items. Having promised this, it would be estopped to eliminate from the award by termination any items just because, separately considered, they were at unfavorable prices, while retaining all those bid at favorable prices. The administration of the contract must be consistent with the rules used in evaluating the bids, to which the bidders conformed in bidding.