BRIAN BARNETT DUFF, District Judge,
dissenting.
The government and its agencies enter into contracts as do private persons, and the common law governs them all. The “ ‘avowed purpose and primary function’ ” of a court when presented with a contractual dispute — including those involving the federal government — “ ‘is the ascertainment of the intention of the parties.’ ” Alvin Ltd. v. United States Postal Service, 816 F.2d 1562, 1564, 1565 (Fed.Cir.1987) (quoting S. Williston, A Treatise on the Law of Contracts § 601 (3d ed. 1961)). See also Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 813-14 (Fed.Cir.1988) (Markey, C.J.). I believe that the court loses sight of this function in this case. Throughout its opinion, the court characterizes the issue as whether the Postal Service’s termination of its contract with Salsbury Industries was “improper.” Whether the Postal Service acted properly or not is not for us to consider. Rather, the issue for this court is whether the Postal Service and Salsbury Industries intended to allow the Postal Service to terminate its contract with Salsbury with impunity under the circumstances presented here. The Postal Service argues that it had this right under the “Termination for Convenience” clause of its contract. I believe that the parties did not intend that the Postal Service could invoke this provision here, and for this reason I dissent from the court’s judgment.
In most contractual disputes, a court begins with the plain language of the parties’ contract. That is what the court does in this case. In fact, the court’s analysis ends with the language of the contract, too: the court reads, “The performance of work under this contract may be terminated by the Postal Service ... in whole ... whenever the Contracting Officer shall determine that such termination is in the best interest *1523 of the Postal Service”; the court concludes that the contracting officer made such a determination in this case, and thus the court holds that the Postal Service acted properly.
By ending its analysis with the words of the parties’ contract, the court fails to give full consideration to what the parties intended. Prior to this case, the court has never given the words of similar termination for convenience clauses their plain meaning, as the court below correctly observed. See 17 Cl.Ct. 47, 56-58 & n. 7 (1989). The termination for convenience clause emerged as a response to problems which the government faced as far back as 1876, and first appeared in defense contracts made during World War I. See Tomcello v. United States, 231 Ct.Cl. 20, 681 F.2d 756, 764-65 (1982) (en banc) (Bennett, J., presenting history of clause). The modern clause carries a jurisprudence which shades its plain meaning. See id., 681 F.2d at 766 (courts do not apply the clause “as broadly as an untutored reading of words might suggest”); Maxima Corp. v. United States, 847 F.2d 1549, 1553 (Fed. Cir.1988) (“termination for convenience ... is not of unlimited availability to the government [nor] an open license to dishon- or contractual obligations”).
Companies should be able to rely upon prior interpretations of termination for convenience clauses when negotiating with the government, rather than insisting on having the government spell out settled law in its contracts. See S. Williston, supra, at § 615. In any event, judicial interpretations of a contractual provision form part of the background against which parties make their contract. When parties incorporate terms which have settled meanings, it is incumbent upon the court to move beyond the plain language of those terms and look at judicial understandings of them. By doing this, the court gives effect to the parties’ intent. This is as it should be, for it is the parties who have bargained, not the courts.
I believe that prior cases of this court and those of its predecessors indicate, at a minimum, that the government may not declare a termination for convenience merely to avoid risks known to the government at the time of contracting. Such was the holding of the majority of judges in Tom-cello. See 681 F.2d at 767-72 (Bennett, J., for plurality) (purpose of termination for convenience clause is to allow government to shift risk of unforeseen changes in circumstances to counter-party); id., 681 F.2d at 773 (Davis, J., concurring) (government may not invoke standard termination for convenience clause to excuse a circumstance which it recognized at the time of contracting). Legal observers have accepted Tomcello as articulating at least this limit on the government’s power to invoke termination for convenience clauses. See Note, Limiting the Government’s Ability to Terminate For Its Convenience Following Tomcello, 52 Geo.Wash.L.Rev. 892, 902 (1984) (“the majority and concurring opinions agree that any termination based on pre-contract knowledge fails for lack of consideration”). This court in Maxima, underscored this principle, albeit in dicta. See Maxima 847 F.2d at 1552.
The court now claims that Tomcello stands for a much narrower proposition, that it limits the government’s recourse to a termination for convenience clause only when the government knows “full well” it will not honor a contract. Tomcello and Maxima lead me to believe that the judges in those cases struggled to attain a wider vision of the doctrine of termination for convenience. Pre-existing intent to breach a contract smacks of bad faith, a concept not central to the discussions in either Tomcello or Maxima. If all that the Tomcello court had to say was that the government should not enter into a contract in bad faith, then the majority of judges in that case expended too great an effort.
The court suggests further that this case stands “[i]n stark contrast” to Tomcello, principally because the Postal Service intended to perform its contract with Sals-bury and did not foresee the injunction which resulted from Doninger Metal Products’s lawsuit. In light of what the Postal Service really foresaw at the time it contracted with Salsbury, the Postal Service’s *1524 intentions were hardly so noble. In 1982, in the midst of Doninger and Salsbury’s competition for the lockbox contracts which are at issue in this case, Postal Service inspectors learned of allegations that Postal Service employees had received kickbacks from Doninger on another contract. The Assistant Postmaster General responsible for procurement thus gave oral directions that the Postal Service was not to award Doninger any contracts until after the clouds lifted. The contracting officer who was supervising the bidding on the lockbox contract thereafter “determined” that Doninger was a “nonresponsible offer- or,” purportedly because of Doninger’s inadequate performance under a prior contract. The contracting officer put her reasons in writing in late November 1982, but did not give them to Doninger.
With the field of bidders essentially smaller by one, the contracting officer awarded lockbox contracts to Salsbury and four other companies in January 1983. It was then that the Postal Service notified Doninger of its disqualification. Doninger protested unsuccessfully to Postal Service, then sued in federal court. After a hearing on the merits, the court determined that the Postal Service’s “finding” of nonre-sponsibility amounted to a de facto suspension of Doninger, one made in violation of Postal Service regulations. The court thus ordered the Postal Service to suspend the performance of the January 1983 lockbox contracts. The Postal Service turned around and told Salsbury to stop work; the dispute over what the Postal Service owed Salsbury resulted in this case.
It is true, in a sense, that the Postal Service did not anticipate the Doninger court’s injunction when it awarded the lock-box contract to Salsbury. Although the contracting officer intentionally had wronged Doninger, it was possible that Doninger — a company which had done business with the government since 1965— could have had a good cry about losing its contract, and walked away without protesting the injustice done to it. It was also conceivable that Doninger could have filed suit, but then lacked sufficient resources to pursue the matter to final judgment. It was further possible that, once it had discovered the contracting officer’s wrongdoing, the Doninger court could have ordered a different remedy. Many things were possible, but what was foreseen? Having knowingly and improperly disqualified a company with Doninger’s experience, the contracting officer had to have known that the Postal Service would get caught. In our society, wrongdoers usually have to make amends, so the contracting officer must have foreseen the risk that once the Postal Service was caught, any contract tainted by its misconduct would be in jeopardy. Nevertheless, the Postal Service disregarded this risk, and entered into a contract with Salsbury.
Having known of the risk of an injunction at the time it contracted with Salsbury, the Postal Service should not be able to use a termination for convenience clause to shift that risk to Salsbury now.* The court holds otherwise. Today, two wrongs make a right. Hereafter, if the government intentionally and unlawfully disqualifies someone when it awards a contract, one should not be surprised when the government forces an innocent recipient of that contract to bear part of the cost of the government’s misconduct. Persons doing business with the government should take heed.

 My belief that the Postal Service may not employ the termination for convenience clause in the fashion approved by the court should not indicate that I believe that Salsbury is entitled to all of the damages which it claims.