No. 41,062

L. N. LAMBERTZ, *Appellee*, v. BUILDERS, INC., a Corporation, and INDUSTRY, INC., a Corporation, *Appellants*.

(331 P. 2d 559)

Opinion filed November 8, 1958.

*Robert Martin*, of Wichita, argued the cause, and *George B. Collins, Oliver H. Hughes, Kenneth W. Pringle, Jr., William F. Schell* and *Thomas M. Burns*, all of Wichita, were with him on the briefs for the appellants.

*Ralph E. Gilchrist*, of Wichita, argued the cause, and *Carl L. Buck* and *Bernard V. Borst*, of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

FATZER, J.: This was an action to recover compensation for services rendered by the plaintiff to the defendants, Builders, Inc., and Industry, Inc. Judgment was entered in favor of the plaintiff. Following the overruling of post-trial motions, the defendants have appealed.

We make no summary of the pleadings except to say that plaintiff's petition alleged generally that he was hired by defendants under a written contract of employment at a base salary of $5,600, which was later modified by an oral agreement placing him upon a commission or bonus arrangement against which the salary he was being paid would be credited; that he was placed in charge

of defendants' commercial real estate business and performed services, the reasonable value of which was $44,121.20, for which judgment was prayed.

The defendants' answer denied the oral agreement modifying the written contract of employment, and affirmatively alleged plaintiff was paid a salary at regular intervals for the entire period of his employment, which he accepted, and that he was estopped to claim compensation in excess of that amount; further, that the action was barred under G. S. 1949, 60-306, *Third.*

Plaintiff's reply denied all allegations in the answer inconsistent with those alleged in his petition.

With the issues thus joined, trial was had by a jury, which returned its verdict in favor of plaintiff for $27,943.42, and made answers to special questions, as follows:

"Q. Were the semi-monthly payments made by the defendants, Builders, Inc., and accepted by the plaintiff, salary or wages, or were they a drawing account against commission?

"A. Drawing account.

"Q. Do you find that the parties on or about February 1, to 10, 1953, altered their original salary agreement to an agreement for bonus or commission and drawing account?

"A. Yes.

"Q. Do you find that the parties ever at any time altered their original salary agreement to an agreement for bonus, or commission and drawing account?

"A. Yes.

"Q. If your answer to Question No. 3 is 'yes', when did they alter it?

"A. February 1, 1953."

The defendants have appealed from the following orders of the trial court: (1) The overruling of their demurrer to plaintiff's evidence; (2) the trial court's refusal to give defendants' requested instruction No. 6; (3) the overruling of their motion for judgment notwithstanding the verdict, and (4) the overruling of their motion for a new trial. Eight specifications of error are assigned, but only three are briefed and argued. Under such circumstances specifications of error which are neither briefed or argued are regarded as abandoned, and on appeal will not be reviewed or considered. (*Brent v. McDonald*, 180 Kan. 142, 150, 300 P. 2d 396.)

Defendants first contend the trial court erred in overruling their demurrer to plaintiff's evidence and submitting the case to the jury, and in refusing to sustain their motion for judgment notwithstanding the verdict. The claim is that plaintiff's evidence was insufficient to

establish an oral modification of the written contract of employment. In making the claim, they concede the rule prevailing in this jurisdiction is that evidence for that purpose must be clear and convincing, that it need not be uncontroverted, but a preponderance of the evidence will suffice. (*Alexander v. Wehkamp,* 171 Kan. 285, 232 P. 2d 440.)

The evidence as disclosed by the record is as follows: Builders, Inc., was engaged in the business of acquiring vacant tracts of land in Wichita and developing the same by erecting buildings and other improvements thereon. Two segments of real estate operations were conducted; the sale and management of residential real estate, and the development, leasing and management of business or commercial properties.

In November, 1952, plaintiff was hired by Willard W. Garvey and C. H. Havens, the managing officers of Builders, Inc., under a written contract of employment, to assist Havens, at a salary of $5,600 per year. Beginning with his employment and continuing until he resigned in January, 1955, plaintiff received from Builders, Inc., semi-monthly payroll checks in an amount computed according to his annual salary. In the years 1953 and 1954 plaintiff returned his income for tax purposes as wages. He was given periodic wage reviews, and his wages were increased from the original monthly rate of $466.68 a month ($5,600 per year) to $490 per month ($5,880 per year) on January 1, 1954. In all, plaintiff was paid $11,510 for the period from November 1, 1952, to February 1, 1955, which, as previously indicated, the jury found to be a drawing account.

On or about February 1, 1953, after he had been employed for some six weeks, it came to the attention of Garvey and Havens that the plaintiff had received a more lucrative job offer from a Kansas City concern. They immediately had a conversation with plaintiff in Garvey's office, which was continued in the West Shack Cafe over a cup of coffee, as to whether he was planning to accept the Kansas City offer. Plaintiff testified that during the conversation in the cafe an oral agreement was entered into by Garvey and Havens and himself to the effect that plaintiff would go on a commission or bonus basis rather than a salary basis; that he would receive a commission for the leases he negotiated if he performed satisfactorily, and would continue to receive the monthly salary as a "drawing account" which would be deducted from earned commissions.

During the conversation Garvey told plaintiff they were thinking of establishing a commercial development, and planned on him being at its head, and stated:

". . . we don't argue with the market, Vern, we pay the going wage in the commercial field. You should be able to make Ten Thousand Dollars ($10,000.00) easily."

Garvey told plaintiff to submit to Havens, through channels, a proposed commission or bonus arrangement, which plaintiff did, the details of which being literally a copy of the Wichita Real Estate Board's recommendations for commercial salesmen to receive as commissions on commercial property.

Both Garvey and Havens were called as witnesses by the defendants. Each testified as to the conversation with plaintiff in the cafe concerning his offer of employment in Kansas City, but denied any promise was made to him that he would then or in the future be given a commission on the company's business, and denied any discussion about any change in his salary or method of compensation.

Following the conversation in the West Shack Cafe, and on February 10, 1953, Industry, Inc., was incorporated and plaintiff was made vice-president. That company took over the part of the business pertaining to the leasing and developing of property owned by Builders, Inc., and leased to tenants for commercial purposes. Havens' testimony defined the term "commercial" as follows:

"In our own company, a commercial is a building owned by the company where the ownership is retained by the company, and a tenant is found to occupy that building on a lease basis."

Plaintiff first began his duties for Industry, Inc., on the development and leasing of the Friendly Shopping Center. He also leased space in the Derby Building. While working on the Friendly Shopping Center he renegotiated existing leases in Parkwood Village Shopping Center. Under the new leases, the base rentals were more than doubled. About the same time, plaintiff was given supervision of a hardware store owned by the Garvey family, a barber shop, and a beauty shop, and he was asked to start negotiations for a new shopping center now known as Parklane. Plans and blueprints were drawn up, and plaintiff began contacting tenants for the new area. He obtained the first lease for Parklane in July, 1953.

In November, 1953, more than nine months after the conversa-

tion in the cafe, plaintiff had secured leases for a major portion of Parklane, 20,000 square feet of which was committed to the F. W. Woolworth Company. The T. G. & Y. Stores contacted plaintiff and offered a larger rental. Garvey told the agent of Woolworth Company that they could no longer be considered, and instructed plaintiff to renegotiate with the T. G. & Y. Stores. Plaintiff told Havens he was going to quit because of Garvey's interference with the Woolworth lease and Havens said, "you can't quit now, otherwise you will lose all the commissions you have been working for."

The original plans for Parklane were changed in November, 1953, and plaintiff worked with the tenants and architects to get the changes that were approved by the tenants into the new plans which were being drawn up. In addition, he negotiated new leases for the unleased portion and worked with loan men concerning the financing. In May, 1954, construction of Parklane was commenced. During July, 1954, plaintiff and Garvey interviewed finance people. Plaintiff, with regard to a conversation with Garvey following the interview, testified:

"Mr. Garvey told me that rental received hadn't been enough for me to get any bonus yet. That I should wait until the rent was coming in, so that they could pay me the bonus. That I needn't worry about it. I told him that if the business wasn't making money, I certainly couldn't ask for it. That I certainly could wait."

Kenneth Kueny, testifying for the plaintiff, stated that in the latter part of October or the first part of November, 1954, he was employed by Garvey for Builders, Inc., on a drawing account and a commission or bonus arrangement. When he discussed the amount of money he could make based upon that arrangement Garvey told him there was every possibility he could make $10,000 to $12,000 per year and cited the plaintiff as an example of how well the defendants were willing to pay people who could produce. Garvey stated that things were starting to roll, and that plaintiff wouldn't have any trouble in making $20,000 to $30,000 per year with bonuses.

Various interoffice memorandums between the defendants and the plaintiff were introduced concerning the payment of his commissions. They are too numerous to set forth. The language of some is ambiguous, but on the whole, all tend to support the plaintiff's testimony that his employment relation with the defendants was changed in the early part of February, 1953, from a base salary to a bonus or commission arrangement for the leasing and development

of commercial properties owned by Builders, Inc., and turned over to Industry, Inc., for management.

The record affirmatively shows that plaintiff performed satisfactorily in the commercial department. During the time he worked for the defendants he negotiated some 36 leases for space in the commercial shopping centers, most of which were 20-year leases, and in Parklane alone the base rentals amounted to approximately two million dollars. Plaintiff's commission was due when the leases were signed by both parties.

In December, 1954, plaintiff asked either Garvey or Havens for a part of his commission so it would not all be paid in 1955. Plaintiff was told to wait until after the first of the year when he got back from his vacation and defendants would discuss the situation then. Upon his return, plaintiff submitted the amount of his commission he then claimed to be due based upon the Wichita Real Estate Board's recommendations. The defendants denied they had agreed to pay him any commission, and plaintiff resigned and commenced this action.

We think plaintiff's evidence preponderates a parol modification of the written contract of employment. That evidence was not, as defendants urge, vague and indefinite. Neither do we think, as defendants contend, that the conversation at the cafe was ambiguous. But, *assuming arguendo*, that it was, we need look no further than to Havens' statement to plaintiff in November, 1953, to the effect that if he quit he would lose all the commissions he had been working for, and to Garvey's statement to plaintiff in July, 1954, that rentals received had not yet been enough to pay commission on, but that he was to wait until the rentals came in so they could pay him a bonus and for him not to worry about it, since, in determining the meaning of an indefinite or ambiguous contract, the interpretation placed upon it by the parties themselves is to be considered by the court and is entitled to great, if not controlling, weight. (12 Am. Jur., Contracts, § 249, p. 787; *Brick Co. v. Bailey*, 76 Kan. 42, Syl. ¶ 3, 90 Pac. 803; *Kirkpatrick v. Chrysler Sales Corp.*, 127 Kan. 724, 275 Pac. 155.) An ambiguity may be said to exist as to whether the commissions were in addition to the semimonthly payments, but if so, it may be ignored because plaintiff sued for the aggregate amount of the commissions earned less a credit for the aggregate amount of the semimonthly payments received. Furthermore, plaintiff did not

seek to enforce the oral contract as a full and complete contract in itself. He made proper allegations for *quantum meruit* for the amount of his commission as being the fair and reasonable value of his services in procuring lessees for the defendants' buildings, evidenced by an understanding, not only by the conversation at the cafe but also by later conversations and interoffice memorandums. The case of *Stewart v. Fourth Nat'l Bank,* 141 Kan. 175, 39 P. 2d 918, is a perfect and complete analysis of this type of action. In the course of the opinion it was said:

"Appellant cites on the first point involved many cases concluding that the contract upon which recovery was sought was too indefinite to establish or be an enforceable contract. Such might have been said as to the contract here under consideration, if the plaintiff had attempted to enforce it as a full and complete contract in itself. The plaintiff in her petition specifically acknowledged its incompleteness in itself by proper allegations for *quantum meruit,* which of course would not have been necessary if the promise and agreement had contained a definite sum as compensation. Some of the cases cited have reference to enforcing liens on lost property, when discovered, after a reward had been offered. The case of *Nichols v. Coppock,* 124 Kan. 652, 261 Pac. 652, is cited where it was held that the sale of property on 'easy terms' was too indefinite. The missing feature there could not be supplied under *quantum meruit* and it was not so attempted. That is very different from employing one and agreeing to pay him reasonable wages. His contract is definite and an action for *quantum meruit* is decidedly proper." (l. c. 177, 178.)

The defendants next contend that by his acceptance of the semimonthly wage checks, plaintiff is estopped to recover the commissions sued for. Not so. The plaintiff claimed, and the jury found, that there was an oral modification of the written contract of employment; that the payment of wages, or the "drawing account," was only a partial compensation of plaintiff's services, and that the remainder was to be paid later in the form of commissions or bonuses. As we have seen, there was sufficient evidence to support that finding. Certainly, the acceptance of the semimonthly checks as a "drawing account" to be deducted from total commissions earned could not operate as an estoppel to a recovery of the reasonable value of the remainder of such services in *quantum meruit* when the amount had not been definitely fixed. We have reviewed the cases of *Harris v. City of Topeka,* 183 Kan. 359, 327 P. 2d 1088; *Jenkins v. City of Lindsborg,* 152 Kan. 727, 107 P. 2d 705; *Sheets v. Eales,* 135 Kan. 627, 11 P. 2d 1020, and other authorities cited by the defendants and they are not in conflict with the views expressed herein. In those cases the wages paid were in full

payment of the obligation and not paid under an arrangement such as is disclosed by the record before us.

Defendants lastly contend that plaintiff's recovery is barred under G. S. 1949, 67-1019 because he failed to plead or prove he was a licensed real estate broker or salesman, and further, that the court erred in refusing to give their requested instruction No. 6. It is argued that since plaintiff alleged and testified that it was agreed he would be put on a "bonus or commission arrangement" and computed his services on the basis of 50 percent of the normal real estate commission, the statute clearly bars recovery. In discussing this contention we quote G. S. 1949, 67-1019:

"Any person engaged in the business of or acting in the capacity of a real estate broker or real estate salesman within this state, shall not be permitted to bring or maintain any action in the courts of Kansas for the collection of compensation for the sale of real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman or a partnership, association or corporation whose members, officers and employees are licensed as required by this act at the time the alleged cause of action arose."

The term "real estate" as used in the foregoing section, relates to the term "sale of real estate" and is defined in subsection (c) of G. S. 1949, 67-1002 to mean, "leasehold, as well as any and every interest or estate in land." The term "real estate broker" is defined in subsection (a) of the same section to include any person who acts "in the expectation or upon the promise of receiving or collecting a fee, commission or other valuable consideration." The term "real estate salesman" is defined in subsection (b) to mean "any person employed or engaged by or on behalf of a real estate broker or by a partnership, association or corporation having one or more real estate brokers licensed under this act to perform any act set out in section 2 (a) of this act for compensation or otherwise." Requested instruction No. 6 was to the effect that if the jury found and believed from the evidence that the plaintiff acted in the capacity of a real estate broker or a real estate salesman, that plaintiff could not recover commission as such because he failed to plead and prove that he was, during the time in question, a licensed real estate broker or salesman.

We think the trial court properly overruled the defendants' demurrer to plaintiff's evidence for the reason he was not required, as hereafter noted, to plead and prove he was a licensed real estate broker or salesman, and correctly refused to give the requested in-

struction. This action pertains entirely to transactions in which the defendants, as lessors, executed to various lessees, leases upon parcels of rental space in defendants' buildings. Although the defendants contend otherwise, the record clearly indicates Builders, Inc., acquired the tracts upon which the shopping centers were constructed and developed them for commercial purposes. The testimony of Garvey and Havens as well as the plaintiff supports this fact. Under such a situation, the plaintiff was not required to plead or prove he was a licensed real estate broker or salesman because the services performed for the defendants falls clearly within the exceptions of G. S. 1949, 67-1003, which, in part, reads:

"The provisions of this act shall not apply to the following: (a) Any person, partnership, association or corporation who, as owner or lessor, performs any act set out in section 2 (a) [67-1002(a)] of this act with reference to property owned or leased by that person, partnership, association or corporation where such act is performed in the regular course of, or as incident to, the management of such property and the investment therein; . . . (f) any employee of any person, partnership, association or corporation enumerated in paragraphs 'a,' 'b,' 'c,' 'd,' or 'e' of this section when engaged in the performance of his duties as such employee."

This section in effect relieves any owner or lessor of property and his employees from the duty of pleading and proving their status as a licensed real estate broker or salesman in order to maintain an action in relation to property owned, leased or managed by such owner. As previously indicated, in all of the transactions involved in this case the defendants were acting in the capacity of lessors of the real estate leased and in so doing they were acting in the regular course of the management of the property and the plaintiff was their agent-employee. Thus, in negotiating and effecting the leases in question, the plaintiff was acting in the performance of his duty as an employee of the defendants, and he was, therefore, exempted from pleading and proving his status as a licensed real estate broker or salesman by subsection (f) of G. S. 1949, 67-1003.

In summary, our review of the record indicates there was ample evidence to justify the trial court in overruling the defendants' demurrer to the evidence, and their motion for judgment notwithstanding the verdict. The matter was submitted to the jury under proper instruction, which, by its general verdict, found all issues in favor of the plaintiff. The special findings were that the written contract of employment was modified by an oral agreement on

February 1, 1953, to an arrangement for commissions or bonuses and a drawing account. These findings were supported by substantial evidence and are binding upon appellate review. We find no merit in the defendants' contention that plaintiff was not their employee. While the oral agreement modified the written contract of employment from a base salary to that of a drawing account plus a bonus or commission arrangement, he nonetheless continued in their employment and was exempt by G. S. 1949, 67-1003 from being a licensed real estate broker or salesman to perform the services of his employment.

We have thoroughly reviewed the record and find no error requiring a reversal. The judgment of the trial court is affirmed.