**EDO CORPORATION, Plaintiff,**

v.

**BEECH AIRCRAFT CORPORATION, Defendant.**

**Civ. A. No. 85–2204–S.**

United States District Court, D. Kansas.

Oct. 21, 1988.

Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, Kan., Richard D. Greene, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., John Cibinic, Annandale, Va., Calvin E. Thorpe, Thorpe, North & Western, Sandy, Utah, for plaintiff.

Paul B. Swartz, Jeff Kennedy, Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

A trial on this matter was held to the court on August 29, 1988, through September 9, 1988. After considering the evidence presented at that trial along with the written submissions of the parties, the court is prepared to rule.

## FINDINGS OF FACT

1. Plaintiff EDO Corporation ("EDO") is a New York corporation, having its principal place of business in the State of New York.

2. Fiber Science, Inc. was a California corporation and a wholly-owned subsidiary of EDO which merged with and into EDO in November 1983. As a result of the merger, EDO became the successor-in-interest to all contractual rights and obligations of Fiber Science, Inc. Fiber Science, Inc., and thereafter EDO's Fiber Science Division (both referred to hereinafter as "FSD") have maintained a principal place of business in Salt Lake City, Utah.

3. Defendant Beech Aircraft Corporation ("Beech") is a Delaware corporation, having its principal place of business in the State of Kansas.

4. Beginning in September, 1982, Beech and EDO entered into a series of research and development contracts related to a new composite aircraft, the Starship. Beech chose EDO's Fiber Science Division as a subcontractor on the Starship research and development program because of FSD's experience with composite filament winding. Composite filament winding is a state of the art process for constructing non-metal aircraft. FSD was to design and construct the main wing for the Starship.

5. The first contract between FSD and Beech provided that FSD would conduct a design study for the wing structure and propose a design to Beech. The parties entered into this first contract in late 1982. The second, third and fourth contracts provided for further design, development and construction of the Starship wing.

6. The contracts incorporated by reference termination clauses identical to those contained in the Armed Services Procurement Regulations (ASPR). The clause at issue here provides as follows:

The performance of work under this contract may be terminated, in whole or from time to time in part, by the buyer in accordance with this clause. Termination of work hereunder shall be effected by delivery to the seller of a Notice of Termination specifying the extent to which performance or work under the contract is terminated and the date upon which such termination becomes effective.

7. This "termination for convenience" clause entitled the terminated party to receive all of its direct costs related to the contract as of the termination date, along with any other direct costs related to termination of the contract, plus a reasonable profit.

8. The first contract between EDO and Beech also provided that all patent and inventive rights arising from the contract would become the property of Beech, except that "procedures, designs, processes and concepts which [were] unique to [FSD] and which were developed prior to this subcontract that [FSD] has documentation for shall be exempt. [FSD] will so indicate in the final report to [Beech] the procedures, designs, processes and concepts that are exempt."

9. The second, third, and fourth contracts contained similar language to that stated above, except that FSD was not required to set out the exempt procedures, designs, processes and concepts in writing.

10. The contracts in question also contained a non-competition clause. That clause provided:

For a period of six (6) years after the date of execution of this subcontract ... subcontractor shall not, except as authorized by contractor, provide to any third party, aircraft wing structure design consulting, manufacturing techniques, or manufacturing, tooling, or other technical information, or otherwise assist any such third party in the manufacturing of aircraft wing structures as the same re-

late to fixed wing aircraft having gross weights less than 85,000 lbs. or with respect to inventions, trade secrets, technical information or data which was developed pursuant to contracts with subcontractor and/or title to the same belongs to contractor per this contract.

In negotiating the contracts, the parties had also considered an alternative clause, which was more inclusive and prohibited EDO from doing work on any aircraft structure, wing or otherwise, for another manufacturer. That option was rejected by the parties, and the less restrictive clause was agreed upon instead.

11. After the December 1982 contract, FSD developed its design concept for the Starship main wing and presented the design study to Beech in April 1983. That study included a proposal that an "H" section concept be employed to attach spars to the wing skins.

12. FSD did not indicate in the report that the "H" section concept was proprietary to FSD or that the concept was exempt from the contractual provision bestowing upon Beech patent and inventive rights to all concepts and designs developed pursuant to the contracts. Nor did FSD indicate at a later time that the concept was proprietary to FSD or exempt for the contractual inventive rights clause.

13. Work under the contracts proceeded, and in late 1983, FSD began to gear up to produce the Starship main wing.

14. In late 1983, FSD was presented an opportunity to bid on a research and development project for an Italian company, Rinaldo Piaggio. Piaggio was developing an aircraft called the GP–180. Like the Starship, the GP–180 was a composite aircraft and was to employ a forward wing as a stabilizer, rather than the more conventional stabilizing back wing.

15. FSD was asked to bid on several components of the GP–180, including the forward wing and the wing tips and flaps on the main wing. FSD was not asked to bid on the main wing itself.

16. FSD officials were enthusiastic about the Piaggio opportunity, and began preparations to submit a bid. They also contacted Beech officials "out of courtesy" to advise them of the Piaggio opportunity.

17. Beech officials were strongly opposed to FSD pursuing the Piaggio opportunity. They cited the fact that Piaggio was a strong competitor of Beech, that the GP–180 would be a direct competitor of the Starship, and that it would be nearly impossible for FSD to keep work on the two projects separate. They also stated that they considered it a breach of the noncompetition clause in the contracts between EDO and Beech.

18. Beech President and Chief Executive Officer, Linden Blue ("Blue"), told FSD officials that if they passed up the Piaggio opportunity and continued to work with Beech, FSD could be assured that it would continue in a productive relationship with Beech for some time into the indeterminate future. He pointed out that working with Piaggio would amount to "consorting with the enemy" and that such an arrangement might alter and compromise FSD's good working relationship with Beech. However, when FSD President Robert Berrisford ("Berrisford") asked Blue for a written commitment to a long term relationship with FSD, Blue refused.

19. FSD ultimately decided to forego the Piaggio opportunity, and instead to continue working with Beech.

20. In early 1984, Beech began to reexamine the Starship project and its progress. Leading this reexamination was D. Brainerd Holmes ("Holmes"), President of Beech's parent company, Raytheon.

21. Holmes and several Beech employees with whom he consulted were dissatisfied with the progress of the Starship project. Holmes did not believe several aspects of the project, including the main wing, were proceeding on schedule. He and several technical advisors at Beech had growing concerns about the feasibility of FSD's proposal. They felt there were too many risks in the method by which FSD proposed the main wing be built. Overall, Holmes felt there were too many "unknowns" with the project, he questioned the use of many outside contractors, and he

was concerned that Beech would not meet its schedule if they did not restructure the program and rid it of the risks.

22. At a meeting on March 20, 1984, Holmes discussed his concerns with the Beech engineering team. The engineering team expressed no confidence in completing the Starship program on schedule or in building the aircraft as originally proposed.

23. After discussing his concerns at that meeting, Holmes decided to order a restructuring of the Starship program. Part of the restructuring proposal was to bring the construction of the main wing "in house" at Beech and employ an alternative design developed for the main wing at Beech.

24. On that same day after the meeting, Blue notified FSD officials that Beech was terminating their contracts.

25. FSD immediately formed a termination team, which would determine all amounts Beech would owe FSD under the "termination for convenience" clause of the contracts.

26. After consultation with Beech officials, the parties agreed on almost all amounts owed FSD. However, the parties disagreed as to whether FSD was entitled to receive "unabsorbed overhead." Unabsorbed overhead is that amount of "fixed" costs incurred at FSD which could no longer be allocated to the Starship project as a portion of the cost of that project. Beech refused to pay any amounts attributable to unabsorbed overhead.

27. Beech subsequently applied for and received a patent on the "H" joint technology. This concept is now being employed in the Starship.

## CONCLUSIONS OF LAW

In a Memorandum and Order dated June 16, 1988, this court disposed of several claims in this case by way of summary judgment. The only remaining claims are as follows: 1) plaintiff's breach of contract claim based on Beech's alleged wrongful termination of the contracts between the parties; 2) plaintiff's breach of contract claim based on Beech's failure to pay unab-

sorbed overhead as allegedly required by the termination clause in the contracts between the parties; 3) plaintiff's claim of promissory estoppel based on EDO's decision to forego the Piaggio opportunity; and 4) plaintiff's claim of misappropriation of trade secret and request for a declaratory judgment as to the proprietary rights in the "H" joint technology. The court will proceed to address each of these claims accordingly.

### I. Breach of Contract/Wrongful Termination

1. By Memorandum and Order dated June 16, 1988, this court adopted the analysis used in *Torncello v. United States*, 681 F.2d 756, 231 Ct.Cl. 20 (1982). *See EDO Corp. v. Beech Aircraft Corp.*, No. 85–2204–S, slip op. at 9 (D.Kan., *unpublished*, June 16, 1988). According to that analysis, in order for the termination clause to be effective, Beech's termination of its contracts with FSD must have been in good faith.

2. The *Torncello* case teaches that a "termination for convenience" clause may be invoked "when the expectations of the parties [have] been subjected to a substantial change," and if "something occurred ... that made continuance of the contract clearly inadvisable." *Torncello*, 681 F.2d at 766.

3. The court finds that especially in a research and development setting employing state of the art technology, a reevaluation and redirection of the program as occurred at Beech in this case is a "substantial change" making continuance of the contract "clearly inadvisable." Composite aircraft employ state of the art technology, and an adventurous, high-risk research and development project such as the Starship project must have substantial leeway to change directions and take new approaches if doubts arise concerning the feasibility of one method. Cancellation of the contract in this case was in good faith and did not constitute a breach of the contract. Therefore, judgment will be for defendant on this aspect of the breach of contract claim.

## II. Breach of Contract/Failure to Pay Unabsorbed Overhead

4. In its Memorandum and Order dated June 16, 1988, this court determined that plaintiff might be entitled to unabsorbed overhead if it could show a direct link between the overhead and the termination of the contract. *See* Memorandum and Order, *EDO Corp. v. Beech Aircraft Corp.*, No. 85–2204–S, slip op. at 12 (D.Kan., *unpublished*, June 16, 1988).

5. After reviewing the evidence in this case, including the testimony of plaintiff's expert, William Murphy, the court concludes that plaintiff did not meet its burden. While plaintiff's expert did show the court how he calculated unabsorbed overhead, he showed the court no evidence that any of the costs included in that amount were directly linked to the Starship project. Nor did any other witness or piece of evidence establish a direct link. Plaintiff's burden at trial was not simply to calculate unabsorbed overhead as a percentage of total overhead. The only conclusion the court is left with is that all "fixed" overhead costs were incidental to conducting the ongoing business of FSD. This conclusion is strengthened by the evidence showing that overhead incurred directly as a result of the Starship contracts (*e.g.*, capital improvements) was reimbursed by Beech upon termination.

6. Since plaintiff has failed to meet its burden to show a direct link between unabsorbed overhead and the contract termination, judgment must be for the defendant on this aspect of the breach of contract claim.

## III. Promissory Estoppel

7. In order to invoke the doctrine of promissory estoppel, the plaintiff must establish that a) defendant made a promise, b) the promise was made under circumstances where the promissor intended and reasonably expected the promise would be relied upon by the promissee, c) the promissee acted reasonably in reliance on the promise, and d) a refusal to enforce the promise would result in an injustice. *Kansas Power & Light Co. v. Burlington N.*

*R.R. Co.*, 544 F.Supp. 1336, 1350 (D.Kan. 1982), *rev'd on other grounds*, 740 F.2d 780 (10th Cir.1984), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 308 (1985); *Berryman v. Kmoch*, 221 Kan. 304, 307, 559 P.2d 790, 794 (1977).

8. As defendant pointed out in its briefs and at trial, no injustice would be suffered by plaintiff in this case if in fact plaintiff was forbidden by its contract with Beech from pursuing the Piaggio opportunity.

9. The court finds that the contract between FSD and Beech prohibited FSD from pursuing the Piaggio opportunity. FSD argues that its contract with Beech only prevented it from doing work on the main wings of other aircraft, and since Piaggio did not present an opportunity to bid on the main wing of the GP–180, FSD could have bid on the project. However, the language of the contract between FSD and Beech contains no such limitation; it prohibits FSD from doing any wing work and does not limit it to the main wing. The court recognizes the variation in terminology used for the forward stabilizer on the Starship and the GP–180. Some evidence showed the forward stabilizer as a "forward wing" or "front wing," other evidence did not employ the term "wing" at all, but instead called the forward stabilizer a "canard." In fact, it appeared from the evidence that the Federal Aviation Administration ("FAA") had not determined what the forward wing should be called on these uniquely designed planes.

However, the terminology used is unimportant in deciding the case. Instead, what is important is the intent of the parties. The court finds that the parties intended the non-competition clause in the contract to prohibit FSD from doing work similar to that it was doing for Beech that would employ similar technology. The evidence did not indicate in any way that the construction FSD would propose for the forward wing on the GP–180 would be substantially dissimilar to that used on the Starship main wing. Instead, it appears that FSD could have made minor modifications to the design developed under contract for the Beech main wing, including

the utilization of the "H" joint, and proposed that same design to Piaggio. According to plaintiff's own evidence, the "H" joint was a valuable device for transferring stress in a composite aircraft, thereby presenting an "elegant" solution to a major problem in composite aircraft design. Certainly the parties intended that FSD be forbidden from taking this technology, which was developed while under contract with Beech, and proposing it to a competitor for use in a similar structure on a similar composite aircraft.

10. Since FSD was prohibited by contract from pursuing the Piaggio opportunity, the court finds that no injustice would be done by refusing to employ the doctrine of promissory estoppel.

11. The court further rejects plaintiff's argument that it could have bid on that portion of the Piaggio proposal not including the forward wing. There was no competent evidence presented which would indicate that FSD representatives told Beech they might pursue this alternative. Any promises or assurances Beech might have made regarding FSD's future with Beech were made in response to statements by FSD that they intended to bid on the entire Piaggio proposal. Thus, plaintiff has not shown the court that Beech promised FSD their relationship would continue if FSD declined to make a more limited bid on the Piaggio aircraft. The only evidence shows that the Piaggio proposal was presented to Beech as a package. Plaintiff has failed to satisfy the first element of promissory estoppel. For the reasons stated, judgment will be for defendant.

IV. *Misappropriation of Trade Secret/Declaratory Judgment Action.*

■ 11. The Kansas Trade Secrets Act provides that a trade secret is "misappropriated" if:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy to limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12. Plaintiff claims that the "H" joint technology is a trade secret belonging to FSD, and that Beech has misappropriated it by filing for and obtaining a patent on the technology and by using the technology on the Starship wing to this day.

13. The court finds that the "H" joint technology was not "acquired by improper means." Instead, the technology was part of the design proposal developed for the Starship by FSD while under contract with Beech. The contract between the parties provided that all technology developed pursuant to the contract would become the property of Beech. The contract which led to the design study excepted designs and concepts "which [were] unique to [FSD] and which were developed prior to this subcontract that [FSD] has documentation for." FSD contends that the "H" joint concept was developed for FSD long before the first Beech contract was signed. However, FSD has no documentation showing the technology predates that contract. The oral evidence given at trial tending to show the technology's preexistence is insufficient to satisfy the contract's requirements. Further, FSD failed to "indicate in the final report to [Beech] the procedures, designs, processes and concepts that are exempt," as required by the contract. Therefore, the technology became the property of Beech once it was incorporated into the design

study developed for the Starship. And while subsequent contracts between the parties did not require FSD to set out the exempt concepts and designs, the technology had already become the property of Beech by operation of the first contract. Therefore, as to any subsequent use of the "H" joint technology by FSD in its ongoing project for Beech, the technology was the property of Beech and therefore not subject to any exemption.

14. Since the "H" joint technology became the property of Beech by virtue of the first contract between the parties, Beech has not misappropriated any trade secret belonging to FSD by its subsequent application and procurement of a patent and use of the technology in the Starship. Judgment will be for the defendant on the misappropriation of trade secret claim and on plaintiff's request for declaratory judgment.

Having failed to meet its burden of proof on any of plaintiff's claims, judgment will be for defendant in the entirety.

IT IS BY THE COURT THEREFORE ORDERED that judgment in this case be entered for the defendant on all pending claims against it.