EDO CORPORATION,
Plaintiff–Appellant,

v.

BEECH AIRCRAFT CORPORATION,
Defendant–Appellee.

No. 88–2816.

United States Court of Appeals,
Tenth Circuit.

Aug. 17, 1990.

Richard D. Greene of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan. (Roger L. Theis, Jana Deines Abbott and Mark A. Ohlsen of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., John Cibinic, Annandale, Va., with him on the briefs), for plaintiff-appellant.

Paul B. Swartz (Robert Martin and Jeff Kennedy with him on the brief) of Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant-appellee.

Before BRORBY, BARRETT and WEST,[*] Circuit Judges.

BRORBY, Circuit Judge.

EDO Corporation (EDO) appeals the district court's rulings on the parties' summary judgment motions contained in the court's Memorandum and Order entered June 16, 1988, 1988 WL 167719; all adverse evidentiary rulings made during trial of the matter held August 29 to September 9, 1988; and adverse rulings in the trial court's Memorandum and Order entered October 21, 1988, containing post-trial findings of fact, conclusions of law, and the court's judgment. We affirm.

## FACTS [1]

Beginning in September 1982, Beech Aircraft Corporation (Beech) and EDO entered into a series of research and development contracts related to a new composite aircraft,[2] the Starship. Beech chose EDO's Fiber Science Division (FSD) as a subcontractor on the Starship research and development program because of FSD's experience with composite filament winding.[3] Under the series of contracts, FSD was to design and construct the main wing for the Starship. 715 F.Supp. at 991.

The first contract between FSD and Beech provided that FSD would conduct a design study for the wing structure and propose a design to Beech. The parties entered into this first contract in late 1982. The second, third and fourth contracts pro-

---

[*] The Honorable Lee R. West, District Judge for the Western District of Oklahoma, sitting by designation.

[1] The facts are recited almost verbatim from the trial court's thorough opinion, *EDO Corp. v. Beech Aircraft Corp.*, 715 F.Supp. 990 (D.Kan. 1988).

[2] "Composites" are combinations of high strength, low weight materials including filament wound carbon graphite fibers and epoxy.

[3] Composite filament winding is a state-of-the-art process for constructing nonmetal aircraft.

vided for further design, development and construction of the Starship wing. *Id.*

The contracts incorporated the following "termination for convenience" clause, borrowed from the federal Armed Services Procurement Regulations:

The performance of work under this contract may be terminated, in whole or from time to time in part, by the buyer in accordance with this clause. Termination of work hereunder shall be effected by delivery to the seller of a Notice of Termination specifying the extent to which performance or work under the contract is terminated and the date upon which such termination becomes effective.

*Id.* The contracts also contained a noncompetition clause that provided:

For a period of six (6) years after the date of execution of this subcontract ... subcontractor shall not, except as authorized by contractor, provide to any third party, aircraft wing structure design consulting, manufacturing techniques, or manufacturing, tooling, or other technical information, or otherwise assist any such third party in the manufacturing of aircraft wing structures as the same relate to fixed wing aircraft having gross weights less than 85,000 lbs. or with respect to inventions, trade secrets, technical information or data which was [sic] developed pursuant to contracts with subcontractor and/or title to the same belongs to contractor per this contract.

*Id.* at 991–92. (The terms "seller" and "subcontractor" in these provisions refer to EDO; "buyer" and "contractor" refer to Beech.) After entering the December 1982 contract, FSD developed its design concept for the Starship main wing and in April 1983 presented the design study to Beech. *Id.* at 992.

Work under the contracts proceeded, and in late 1983 FSD began to gear up to produce the Starship main wing. At that time, FSD was presented an opportunity to bid on research and development of a composite aircraft project for an Italian compa-

ny, Rinaldo Piaggio. FSD was asked to bid on several components of the aircraft, including the forward wing, or canard, and the wing tips and flaps on the main wing, but was not asked to bid on the main wing itself. *Id.* Although FSD officials were enthusiastic about the Piaggio opportunity, Beech officials were strongly opposed to FSD pursuing the Piaggio opportunity. They believed that FSD's participation in the Piaggio project would be a breach of the noncompetition clause in the contracts between EDO and Beech. *Id.* FSD ultimately decided to forego the Piaggio opportunity and continued working with Beech. *Id.*

In early 1984, Beech began to reexamine the Starship project and its progress. Brainerd Holmes, president of Beech's parent company, Raytheon, and several Beech employees were dissatisfied with the progress of the Starship project. They had growing concerns about the feasibility of FSD's proposal and felt there were too many "unknowns" with the project and too many risks in the method by which FSD proposed the main wing be built. *Id.* On March 20, 1984, Holmes discussed his concerns with the Beech engineering team. The engineering team expressed no confidence in completing the Starship program on schedule or in building the aircraft as originally proposed. *Id.* at 993. Holmes then decided to order a restructuring of the Starship program, including bringing the construction of the main wing "in house" at Beech and employing an alternative design developed for the main wing at Beech. That same day Beech president Linden Blue notified FSD that Beech was terminating their contracts. *Id.*

FSD immediately formed a termination team to determine all amounts Beech would owe FSD under the "termination for convenience" clause of the contracts. The parties agreed on some amounts owed FSD, but disagreed as to whether FSD was entitled to receive "unabsorbed overhead."[4] Beech refused to pay any

---

4. The trial court defined "unabsorbed overhead" as "that amount of 'fixed' costs incurred at FSD which could no longer be allocated to the Star-

amounts attributable to unabsorbed overhead. *Id.*

EDO filed suit, claiming the termination was improper because the original contract did not permit termination absent a change of circumstances or, alternatively, because the contract had been modified to delete the termination clause. EDO also claimed that even if the termination were proper, FSD was entitled to additional compensation (unabsorbed overhead) under the contract. FSD joined claims of detrimental reliance, breach of fiduciary duty, and misappropriation of trade secrets, seeking a recovery of actual and punitive damages in excess of $50 million.

After joint motions for summary judgment, the trial court denied EDO's motion for summary judgment but stated that "unabsorbed overhead may be recoverable under settlement of the terminated contract." Memorandum and Order, June 16, 1988, at 17. The court granted summary judgment to Beech on EDO's claims concerning an orally modified contract, the unavailability of anticipatory profits as a measure of recovery under the settlement of the terminated contract, and breach of fiduciary duty. *Id.* After a two-week trial on the remaining claims, the trial court determined that EDO failed to meet its burden of proof on any of its claims, and entered judgment for Beech on all pending claims. 715 F.Supp. at 996.

On appeal EDO argues: (1) the trial court erred in refusing to award unabsorbed overhead as a part of termination damages; (2) the trial court erred in finding a change of circumstances sufficient to justify termination; (3) the trial court erred in granting summary judgment against EDO on oral modification of the contracts; and (4) the trial court erred in its application of the elements of promissory estoppel.

## UNABSORBED OVERHEAD

■ EDO argues the trial court erred in refusing to award unabsorbed overhead as

ship project as a portion of the cost of that

a part of the termination costs for a proper termination.

Our review of a trial court's determination of the amount of damages resulting from a breach of contract is governed by the clearly erroneous standard. Fed.R. Civ.P. 52(a); *Paramount Pictures Corp. v. Thompson Theatres, Inc.,* 621 F.2d 1088, 1091 (10th Cir.1980). We are not constrained by the clearly erroneous standard, however, when the trial court's computation of damages is predicated on a misconception of the governing rule of law. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501 [104 S.Ct. 1949, 1960, 80 L.Ed.2d 502] (1984). *Chaparral Resources, Inc. v. Monsanto Co.,* 849 F.2d 1286, 1289 (10th Cir.1988) (citations omitted). Thus, in reviewing challenges to a trial court's determination of damages ·in a breach of contract case, we must distinguish between the challenge to the computation of the amount from the challenge to the law applied in computing that amount.

EDO argues the trial court misapplied the law and asks this court to "exercise its independent judgment and determine whether the record establishes that the governing rules of law regarding unabsorbed overhead were applied correctly by the trial court." The trial court determined that EDO failed to meet its burden of proof on the issue of unabsorbed overhead. 715 F.Supp. at 994.

In its order on the motions for summary judgment, the trial court stated:

[I]t appears to the court after a review [of the authorities cited by the parties] that unabsorbed overhead supported by proof sufficient to establish a *direct link* to the termination of the contract is recoverable in certain circumstances. Given the previous analysis by the court concerning the commercial nature of these contracts and the absence in this case of the special consideration normally afforded in government procurement of contracts, the court believes that the present case is an appropriate one for

project." 715 F.Supp. at 993.

recovery of unabsorbed overhead, *contingent upon proper proof* at trial, in the event that the factfinder fails to find a breach of contract.

Memorandum and Order, June 16, 1988, at 12 (emphasis added). The trial court defined unabsorbed overhead as "that amount of 'fixed' costs incurred at FSD which could no longer be allocated to the Starship project as a portion of the cost of that project." 715 F.Supp. at 993 (Finding of Fact No. 26).

EDO agrees with the trial court's definition of unabsorbed overhead but contends that after trial the district court changed this definition and the required proof. In other words, according to EDO, after the court stated in its rulings on the summary judgment motions that proof of a "link" between *termination* and unabsorbed overhead would be required, the court changed the requisite "linkage" to one between unabsorbed overhead and the *Starship project*. EDO claims this change required FSD literally to "prove the impossible." The company further asserts that this "change in the standard of proof reflects a basic misunderstanding of the nature of unabsorbed overhead and was a clear error of law."

We note first that the district court arguably would have been justified in ruling that unabsorbed overhead was simply not recoverable under the termination provision of the Beech–EDO contracts. The termination clause did not expressly provide for payment of this element of damages. Moreover, where the federal government is a party to the contract and invokes the so-called "termination for convenience" clause, such damages apparently are not recoverable against the government. *E.g.,* *Nolan Bros., Inc. v. United States,* 437 F.2d 1371, 1389, 194 Ct.Cl. 1 (1971) (finding no precedent for awarding post-termination general and administrative expenses to nonterminating party). However, the court determined that the Beech–EDO contracts were governed by ordinary commercial contract principles and accordingly ruled that "the recovery of unabsorbed overhead [is appropriate], contingent upon proper proof at trial." Beech has not appealed this rul-

ing. We agree that, under commercial contract principles, *see, e.g.,* U.C.C. § 2–708, and given sufficient proof, EDO *might* have been entitled to recover its unabsorbed overhead.

Nevertheless, we agree with Beech that appellant's argument concerning the altered standard of proof is largely semantic. We discern no difference between the standard of proof announced by the court in its summary judgment ruling and that reiterated in its post-trial conclusions of law. Rather, the court denied appellant's claim for unabsorbed overhead simply because EDO's proof of this element of damages was deficient. The court stated:

> After reviewing the evidence in this case, including the testimony of plaintiff's expert, William Murphy, the court concludes that plaintiff did not meet its burden. While plaintiff's expert did show the court how he calculated unabsorbed overhead, he showed the court no evidence that any of the costs included in that amount were directly linked to the Starship project. Nor did any other witness or piece of evidence establish a direct link. Plaintiff's burden at trial was not simply to calculate unabsorbed overhead as a percentage of total overhead. The only conclusion the court is left with is that all 'fixed' overhead costs were incidental to conducting the ongoing business of FSD. This conclusion is strengthened by the evidence showing that overhead incurred directly as a result of the Starship contracts (*e.g.,* capital improvements) was reimbursed by Beech upon termination.

715 F.Supp. at 994 (Conclusion of Law No. 5). Our review of the district court's orders and the record convinces us that the trial court used the proper standard of proof and was consistent in applying this standard, and that EDO failed to establish what portion of unabsorbed overhead could properly be allocated to the terminated work.

At trial, EDO's expert witness William Murphy was asked during direct examination to "tell the Court whether there's any

way to demonstrate a direct link or direct relationship between that unabsorbed overhead to the terminated work." In response, however, Mr. Murphy embarked on an academic explanation of Cost Accounting Standards Board methods and undertook to comment on certain case law. The court sustained an objection to this answer, and plaintiff's counsel abandoned the subject of overhead to pursue a separate item of damages.[5] At no point during his testimony (which we find ambiguous and confusing) did Mr. Murphy explain the connection, if any, between the amount of unabsorbed overhead expenses incurred by EDO and the termination by Beech of the Starship contracts. Mr. Murphy discussed how EDO's estimate of unabsorbed overhead was calculated and confirmed by modeling, but he failed to explain how the unabsorbed overhead estimate (or any component thereof) was related to the Beech contracts.

Beech's expert, on the other hand, discussed the various components of EDO's reported overhead expenses and illustrated for each component how the expense had not changed significantly during the Beech contract period or how (in the case of personnel, for example) EDO had reduced the expense after termination of the contracts (e.g., by reducing the work force). He also pointed out what, in his opinion, were flaws in the premises of the model employed by EDO's witness.

Our deference to the trial court as factfinder on this issue is corroborated by our own review of the record. We hold the district court was correct in ruling that EDO failed to sustain its burden of proof with respect to this element of damages.

## CHANGE OF CIRCUMSTANCES

■ EDO next argues the trial court erred in finding a change of circumstances sufficient to justify termination under the "termination for convenience" clause. EDO also argues the trial court misapplied the law governing such terminations.

The district court's decision on this issue was guided by the analysis in *Torncello v. United States*, 681 F.2d 756, 231 Ct.Cl. 20 (Cl.Ct.1982) (en banc). 715 F.Supp. at 993. *Torncello* summarized the case law up to that time concerning exercise of the "termination for convenience" clause in government contracting situations. The claims court concluded that the function of the clause, as held by those cases, was "to allocate the risk of a change in the circumstances of the bargain or in the expectations of the parties." 681 F.2d at 766.

In *Torncello* the government terminated a contract to take advantage of a lower price of which it had known at the time it entered into the contract with the plaintiff at a higher price. The court noted that the government's invocation of the termination clause allowed it to "walk away from all of its contractual obligations." *Id.* at 760. The court held that the government's exculpatory use of the clause in these circumstances was improper because it would "vitiate the consideration normally furnished by the government for a requirements contract without substituting any other sufficient obligation." *Id.* at 770. In other words, in those circumstances it would render illusory the government's obligations under the contract. The court held that availability of the clause was restricted "to situations where the circumstances of the bargain or the expectations of the parties have changed sufficiently that the clause serves only to allocate risk." *Id.* at 771. But it cautioned: "We hold in this opinion only that the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations." *Id.* at 772. Thus,

if the government were to change its convenience termination procedures in such a way that valid consideration was still furnished in an exculpation situation, by limiting its power to terminate in some way that would be consideration for the contract if it alone had been bargained for, then convenience termi-

---

**5.** We find no error in the trial court's sustaining the objection to this testimony, particularly in light of the failure of plaintiff's counsel to defend against the objection or to make any further attempt to obtain a direct answer from the witness.

nation for exculpatory purposes would also be proper.

*Id.*

In the case at bar, the district court concluded that,

especially in a research and development setting employing state of the art technology, a reevaluation and redirection of the program as occurred at Beech in this case is a "substantial change" making continuance of the contract "clearly advisable." ... Cancellation of the contract in this case was in good faith and did not constitute a breach of contract.

715 F.Supp. at 993 (Conclusion of Law No. 3). We concur with this reasoning.

The circumstances of this case differ markedly from those that concerned the court in *Torncello*. Beech could not terminate the EDO contracts with impunity. From the moment the contracts were entered into, Beech incurred obligations thereunder, unlike in *Torncello*, where the government never ordered—nor was it required by the contract to order—any services from the plaintiff. Beech and EDO had mutual obligations under these contracts; Beech provided notice to EDO of its intent to terminate; it entered into a settlement for the payment of damages following termination; and, as the district court found, its actions evidenced good faith.[6]

Although we agree with the district court that "changed circumstances or expectations," within the contemplation of *Torncello*, did exist in this case, we find it unnecessary to decide whether Beech must be able to point to such a change in order to invoke the clause. Absent the concern present in *Torncello*—that the obligations of the party possessing the unilateral right of termination are illusory due to want of consideration—we will enforce a contract freely entered into by two competent parties. Here, Beech's power of termination was clearly supported by consideration. Accordingly, we affirm the district court's conclusion that Beech's termination of the EDO contracts did not constitute a breach of those agreements.

## ORAL MODIFICATION

■ EDO next claims that the district court erred in granting summary judgment against EDO on the issue of oral modification of the contracts. In reviewing a grant of summary judgment, we apply the same standards employed by the district court, affirming if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Osgood v. State Farm Mutual Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988).

EDO claims that Linden Blue's oral assurances of a continuing relationship with Beech, *see* 715 F.Supp. at 992 (Finding of Fact No. 18), modified the written contracts to delete Beech's right to terminate the contracts for convenience. According to EDO, the district court erroneously assumed EDO was arguing that these oral statements created enforceable contractual commitments *beyond* the period of the written contracts. The district court further erred, EDO claims, in relying on the contract prohibition against oral modification.

---

6. The *Torncello* court rejected good faith as a meaningful limit on the government's right to terminate, but only because the government is presumed to act in good faith ("subject only to an extremely difficult showing by the plaintiff to the contrary"). 681 F.2d at 770. Thus, the claims court concluded: "[T]he government's obligation to act in good faith hardly functions as the meaningful obligation it may be for private persons." 681 F.2d at 771. Here, relying on *Bonanza Inc. v. McLean*, 242 Kan. 209, 747 P.2d 792, 801 (1987) (noting "modern trend is to apply the duty of good faith and fair dealing in every contract"), and distinguishing *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 608 P.2d 890, 896 (1980) (holding motive in terminating irrelevant where contract gives absolute, *but mutual,* right to terminate), the district court decided "that the Kansas Supreme Court would place some restriction on Beech's right to terminate." Memorandum and Order, June 16, 1988, at 11. We concur in the district court's determination that Beech's exercise of its right to terminate must have been in good faith. 715 F.Supp. at 993; *see also Goff v. American Savings Ass'n*, 1 Kan.App.2d 75, 561 P.2d 897, 901 (1977) ("[g]ood faith is required in every business transaction"). Moreover, we agree with the trial court that Beech's cancellation of the contracts was done in good faith. 715 F.Supp. at 993.

EDO claims that the following excerpt from the district court's order on summary judgment motions reveals that the court believed EDO was arguing for an extension of the contracts' terms:

> The court finds that the types of oral commitments alleged to have been made by Beech management concerning a long-term partnership are simply too amorphous to support a contractual modification. No term of years was given, nor were any promises of specific future production or research and development projects made.

Memorandum and Order of June 16, 1988, at 11. However, we are unable to conclude from this statement that the district court misunderstood EDO's oral modification claim. It could as easily be construed as indicating simply that the court found that Blue's oral assurances did not alter the firmness or permanence of Beech's contractual relations with EDO. However, EDO's contention that these assurances of some sort of "long-term" or "permanent" relationship reflect only on the viability of the termination clause and not on the contracts' term is logically and internally inconsistent (see the following section of this opinion) and may have contributed to the district court's confusion, if any, on this point.

■ Regardless of the district court's understanding of the scope of the contract modification sought by EDO, however, we agree that the oral assurances cited by EDO are "too amorphous" to vary any written term of the parties' agreements. Although Kansas law allows modification of the terms of a written agreement on the basis of oral promises under certain circumstances, the burden is on the plaintiff to prove by clear and convincing evidence an intent to so modify the agreement. *E.g., Lambertz v. Builders, Inc.,* 183 Kan. 602, 331 P.2d 559, 560 (1958); *Alexander v. Wehkamp,* 171 Kan. 285, 232 P.2d 440 (1951). Evidence of vague, indefinite, or ambiguous statements will not suffice.

*See Lambertz,* 331 P.2d at 563. At best, the statements of Mr. Blue and FSD president Berrisford to which EDO refers us are ambiguous as to the parties' intent regarding the termination clause. At worst, they reveal nothing whatsoever with respect to that contract provision. The statements certainly do not constitute clear and convincing evidence of an intent to modify an express term of each of the Beech–EDO agreements. We affirm the district court's grant of summary judgment to Beech on this claim.

## PROMISSORY ESTOPPEL

Finally, EDO argues that Blue's oral assurances to FSD *"also* supported a promise for additional work beyond the existing contracts[, which] becomes enforceable as a result of FSD's detrimental reliance." EDO claims it forewent the Piaggio opportunity on the basis of Blue's assurances and that it is thus entitled to expectancy damages on a promissory estoppel theory. EDO complains that the trial court erred both in finding no promise and in finding there would be no injustice if the promise were not enforced.

■ The trial court correctly stated the requirements for invoking promissory estoppel; to wit:

> [T]he plaintiff must establish that a) defendant made a promise, b) the promise was made under circumstances where the promisor intended and reasonably expected the promise would be relied upon by the promisee, c) the promisee acted reasonably in reliance on the promise, and d) a refusal to enforce the promise would result in an injustice.

715 F.Supp. at 994 (citing *Kansas Power & Light Co. v. Burlington N.R.R. Co.,* 544 F.Supp. 1336, 1350 (D.Kan.1982), *rev'd on other grounds,* 740 F.2d 780 (10th Cir. 1984), *cert. dismissed,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 308 (1985); *Berryman v. Kmoch,* 221 Kan. 304, 559 P.2d 790, 794 (1977)).[7] Similarly, in *Marker v. Pre-*

---

**7.** The principle of the doctrine of promissory estoppel is restated in § 90 of the Restatement (Second) of the Law of Contracts, which "has long been recognized and relied upon by [the Kansas Supreme Court.]" *Kirkpatrick v. Seneca*

*ferred Fire Ins. Co.*, 211 Kan. 427, 434, 506 P.2d 1163, 1170 (1973), the Kansas Supreme Court held that

> in order for the doctrine of promissory estoppel to be invoked the evidence must show that the promise was made under circumstances where the promisor *intended and reasonably expected* that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise.

(Emphasis added.)

■ The district court held that the noncompetition clause in the Beech contracts would prohibit the proposed Piaggio work; thus, there would be no injustice in not enforcing Beech's alleged promise. In response to EDO's claim that it could have bid on a part of the Piaggio work excluding the forward wing (which latter work arguably would have been forbidden by the Beech contracts), the court held that there was "no competent evidence presented which would indicate that FSD representatives told Beech they might pursue this alternative." 715 F.Supp. at 995 (Conclusion of Law No. 11). The court concluded that EDO had not shown "that Beech promised FSD their relationship would continue if FSD declined to make a more limited bid on the Piaggio aircraft," *id.;* thus, the court ruled that EDO failed to satisfy the first element of promissory estoppel.

Although the evidence on the matter is controverted, we cannot say that the district court's finding with respect to FSD's opportunity to make a limited bid to Piaggio, and Beech's knowledge of that opportunity, is clearly erroneous. Accordingly,

we would affirm the court's ruling that EDO did not make the necessary showing on the first element of promissory estoppel. It is perhaps clearer, however, that EDO also failed to provide proof of the second element—that Beech made the alleged promises with the *intention* and the *reasonable expectation* that EDO would rely on them in foregoing the Piaggio opportunity. There is no suggestion that "promises" were made by any Beech employee other than Linden Blue. Blue testified that he "thought that the contract probably provided that [FSD] couldn't, or shouldn't" do the Piaggio project but that "if it wasn't specifically prohibited by the contract, that [he] thought it was [prohibited] from an ethical and team performance standpoint." Believing this, it is unlikely that Mr. Blue intended or relied on his indefinite assurances to FSD to induce FSD to forego the Piaggio work. Furthermore, the indefinite nature of those assurances and Mr. Blue's admission that he was unwilling to make any commitment to FSD concerning future production strongly suggest it would have been unreasonable for Mr. Blue or Beech to expect such assurances to induce FSD to forego the Piaggio work. Absent this intent and reasonable expectation, EDO's showing on the second element of promissory estoppel fails.[8]

■ Finally, with respect to the scope of the noncompetition clause, the district court found that "the parties intended the [clause] to prohibit FSD from doing work similar to that it was doing for Beech that would employ similar technology." 715 F.Supp. at 994 (Conclusion of Law No. 9). We agree.[9] However, EDO correctly

---

*Nat'l Bank,* 213 Kan. 61, 515 P.2d 781, 786 (1973). Section 90 states:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Quoted in* 515 P.2d at 786.

**8.** Arguably, FSD's reliance on the indefinite assurances of Mr. Blue (particularly in light of his refusal to make any commitment to FSD regarding future production), in deciding to forego the

Piaggio opportunity, was also unreasonable. Had the district court so found, EDO would have failed to make the requisite showing under the third element of promissory estoppel as well.

**9.** Although the trial court characterized this finding as a conclusion of law, a question concerning the intent of contracting parties is generally considered a question of fact. As such, we must affirm this finding of the district court's unless it is clearly erroneous. *Chaparral Resources,* 849 F.2d at 1289. Our review of the record convinces us the court's finding is a correct construction of the parties' intent.

points out that, even if the Beech contracts disallowed the Piaggio work, FSD's foregoing the opportunity *could* have provided adequate consideration to support the alleged exchange of promises *if* FSD had believed in good faith that the work was *not prohibited* (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 738, 81 S.Ct. 886, 891, 6 L.Ed.2d 56 (1961) (citing Restatement, Contract §§ 75–76); *Reed v. Kansas Postal Tel. & Cable Co.*, 125 Kan. 603, 264 P. 1065 (1928)). The district court apparently overlooked this principle. *See* 715 F.Supp. at 994–95. Nevertheless, EDO's argument in this regard fails upon scrutiny of the evidence of its asserted good faith belief that the Piaggio work was not prohibited.

Specifically, EDO cites FSD president Berrisford's testimony in support of its claim that FSD believed in good faith that the Piaggio work was not barred by the noncompetition clause. Replying to Beech's counsel's question on cross-examination as to whether Berrisford and Blue "had discussed the fact that [the Piaggio] work was prohibited by the noncompete clause," Mr. Berrisford first stated: "That was never brought up. . . . Linden Blue did not say that it was prohibited and *we had not determined that in any way it was prohibited.*" (Emphasis added). However, Mr. Berrisford then acknowledged that he had heard Blue's testimony the previous day that "he [Blue] recalled telling [Berrisford] that if [the Piaggio work] wasn't prohibited it certainly ought to be because of the competitive nature of the aircraft." (Blue's testimony as restated by counsel for Beech; *cf.* Tr.Vol. I, at 99–100 (testimony of Linden Blue)). Mr. Berrisford then admitted that he "recall[ed] a discussion with Linden Blue. He did not tell me it certainly ought to have been prohibited but, in fact, you know, the discussion was very similar to as it was related yesterday [by Blue]."

In our view, the inconsistency in Berrisford's testimony and its ambiguity concerning FSD's assessment of the noncompetition clause do not evidence a good faith belief that the Piaggio work was not prohibited. Berrisford's statement that FSD "had not determined that in any way [the Piaggio work] was prohibited" is *not* equivalent to saying FSD believed the work would be allowed under the contract. Our conclusion is reinforced by two telegrams in the record that reveal EDO had doubts, at least initially, about the effect of the noncompetition clause on pursuing a Piaggio contract ("Beech agreement may blow [Piaggio work] out of the tub"; "implications of contract with Beech not totally clear, however, FSD willing to at least look at drawings and specs and worry about Beech later"). We conclude EDO lacked a good faith belief that it would not be prohibited by its agreements with Beech from pursuing the Piaggio opportunity. We agree with the district court that EDO has failed to prove its claim based on promissory estoppel.

Accordingly, the district court's decision is AFFIRMED.